28 F.2d 748 (1928)
MASTIN
v.
COMMISSIONER OF INTERNAL REVENUE.
No. 347.
Circuit Court of Appeals, Eighth Circuit.
September 29, 1928.
Charles M. Howell, of Kansas City, Mo. (Daniel V. Howell, of Kansas City, Mo., James Hagerman, Jr., of Washington, D. C., and Joseph S. Brooks, of Kansas City, Mo., on the brief), for petitioner.
L. W. Scott, Sp. Atty., Bureau of Internal Revenue (Mabel Walker Willebrandt, Asst. Atty. Gen., C. M. Charest, General Counsel, Bureau of Internal Revenue, of Washington, D. C., and Harvey R. Gamble, Sp. Asst. Atty. Gen., on the brief), for respondent.
Before VAN VALKENBURGH and BOOTH, Circuit Judges, and POLLOCK, District Judge.
BOOTH, Circuit Judge.
This is a petition for review of two orders of the Board of Tax Appeals redetermining deficiencies in the income taxes of petitioner. The first order covered the years 1918, 1919, and 1920, and redetermined deficiencies for those years in the amounts of $6,394.60, $13,937.41, and $7,309.46, respectively. The second order covered the year 1922, and redetermined the deficiency in the amount of $3,483.58. The two *749 matters were consolidated before the Board of Tax Appeals for the purpose of hearing. They will be considered together here.
The deficiencies found by the Board of Tax Appeals were based upon the disallowance of certain deductions claimed by the petitioner as losses. The alleged losses consisted (1) of certain payments made by petitioner to his mother and to his aunt for their support during the years mentioned pursuant to the provisions of two written instruments; (2) of an amount paid by petitioner for advertising certain real estate owned by a corporation in which petitioner and others were interested.
The pertinent provisions of the statutes are found in the Revenue Acts of 1918 (40 St. 1057) and 1921 (42 St. 227). They are identical and read as follows:
"Sec. 214. (a) That in computing net income there shall be allowed as deductions:

* * * * * * * * *
"(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in trade or business;
"(5) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in any transaction entered into for profit, though not connected with the trade or business."
Article 141, Regulations 45, promulgated by the Treasury Department pursuant to the Revenue Act of 1918, contains the following provision, deemed material.
"Losses.  Losses sustained during the taxable year and not compensated for by insurance or otherwise are fully deductible * * * if (a) incurred in the taxpayer's trade or business, or (b) incurred in any transaction entered into for profit. * * * They must usually be evidenced by closed and completed transactions. * * *"
The facts as found by the Board of Tax Appeals are, in substance, as follows: In 1905 the petitioner, his mother, Elizabeth Simpson Mastin, his aunt Julia Mastin, and his sister Theo Mastin, entered into an agreement of trust. It is set out in the margin, so far as here material.[1] Pursuant to the terms of that agreement a corporation was organized under the name of the Mastin Realty & Mining Company, to which the parties conveyed all of the interests they had in certain properties. Another corporation was also organized for the purpose of holding the stock of the Mastin Realty & Mining Company. This corporation was known as the Mastin Estate; and to it the stock of *750 the Mastin Realty & Mining Company was conveyed. The stock of the holding company was held by the petitioner as trustee in accordance with the trust agreement. The petitioner managed and directed the corporations. He did considerable financing for the purpose of protecting the properties and the equities therein which had been conveyed to the first-named corporation. He arranged a loan of $400,000, which was secured by a bond issue. Only $272,000 of that amount, however, was needed and used by the corporation. A number of the equities were sold and the proceeds applied to the payment of debts against other properties. Up until 1914 there was not enough income accruing to the corporation to meet the expenses. The petitioner's mother and aunt needed funds for their living expenses and maintenance. As a consequence, another contract was entered into in 1914. Meanwhile Theo Mastin had married George Edgar Lovejoy. This second agreement is set out in full in the margin.[2]
*751 During the taxable years here in question, petitioner paid out the following amounts as indicated:

 To his mother and aunt, 1918 ...... $12,346.64
 1919 ...... 11,783.64
 1920 ...... 14,852.24
 1922 ...... 10,567.13
 For advertising some of the
 real estate covered by the
 trust agreement ................ 4,245.25

The amounts paid to petitioner's mother and aunt were for their support and were paid pursuant to the agreement of 1914.
Upon the facts thus found, and a finding to be mentioned later, relative to the payment for advertising, the Board of Tax Appeals held that the agreement of 1914 canceled the agreement of 1905. It held further that none of the payments above mentioned made by petitioner were deductible as losses under the statute above cited, and it redetermined the deficiencies of petitioner's income tax for the years in question on the basis of disallowing as losses the payments above mentioned.
No question is raised as to the correctness of the figures, if the legal conclusions of the Board of Tax Appeals are right.
Upon this petition we do not review the facts found by the Board of Tax Appeals, since there was substantial evidence to support them. We review questions of law only. Avery v. Commissioner of Internal Revenue (C. C. A.) 22 F.(2d) 6, 55 A. L. R. 1277; Royal Packing Co. v. Commissioner of Internal Revenue (C. C. A.) 22 F.(2d) 536.
The contentions of petitioner are:
First, that the agreement of 1905 was not and could not be canceled by the agreement of 1914, because the former agreement constituted an irrevocable trust and some of the parties interested in the trust, to wit, the lineal heirs of Thomas Mastin and of Theo Mastin, did not join in the agreement of 1914.
*752 Second, that the payments made by petitioner to his mother and aunt, and the one for advertising certain real estate, were all payments by petitioner while acting as trustee under the agreement of 1905 and while also acting under the agreement of 1914, and especially the clause thereof reading as follows: "Whereas said Thomas H. Mastin is willing to undertake the management and control of said shares of stock and properties and has this day agreed, and does hereby agree to undertake the management and control thereof, for the purpose of realizing an income and profit therefrom for the benefit and use of all the parties hereto"  and that the payments were "losses" within the provisions of section 214 (a) (4) and (5) of the act of 1918, above quoted.
We do not find it necessary to a decision of the case at bar to determine the several interesting legal questions arising under petitioner's first contention. We may assume for present purposes that the position of petitioner, that the agreement of 1905 was not canceled by the agreement of 1914, is correct. But the correctness of the second contention of petitioner does not necessarily follow from the correctness of the first.
Though the agreement of 1914 may not have canceled the agreement of 1905, yet it very materially modified the rights of some of the parties to that agreement. The agreement of 1914 recited that Julia Mastin and Elizabeth Mastin were owners of shares of stock in Mastin Estate and in Mastin Realty & Mining Company and of other property. The agreement further recited that they desired to divest themselves of the title to said shares of stock and other property. The agreement provided that they did transfer, set over, and assign to Thomas Mastin and Theo Mastin Lovejoy all the right, title, and interest in and to the shares of stock mentioned, with all dividends thereon accrued, and all other property by them owned. The agreement further provided that Thomas Mastin and Theo Mastin Lovejoy should pay the actual expenses and household maintenance and sustenance and support of Julia Mastin and Elizabeth Mastin during their natural lives respectively.
It is clear, therefore, that by the 1914 agreement Julia and Elizabeth Mastin (1) disposed of all their real and personal property, if any, to Thomas Mastin and Theo Mastin Lovejoy; (2) disposed of their rights to share equally with Thomas Mastin and Theo Mastin Lovejoy in the dividends from the trust properties for all future time; (3) surrendered all survivorship rights under the 1905 agreement in the corpus of the trust property. These various property rights passed from Julia Mastin and Elizabeth Mastin to Thomas Mastin and Theo Mastin Lovejoy. In return and as consideration therefor Thomas Mastin and Theo Mastin Lovejoy agreed to furnish to Julia Mastin and Elizabeth Mastin support and maintenance without regard to the amount of dividends which might be paid from the trust estate.
Such being the character of the provisions in the agreement of 1914, can it be fairly said that the above-mentioned payments made by petitioner to Julia Mastin and Elizabeth Mastin pursuant thereto should be considered "losses" within the statutes and regulations above quoted?
In the case of Mente v. Eisner (C. C. A.) 266 F. 161, 11 A. L. R. 496, the court, in construing a somewhat similar provision in the Revenue Act of 1913 (38 Stat. 114), used the following language in speaking of "losses":
"We think that the language `losses incurred in trade' are correctly construed by the Treasury Department as meaning in the actual business of the taxpayer, as distinguished from isolated transactions. If it had been intended to permit all losses to be deducted, it would have been easy to say so. Some effect must be given to the words `in trade.'"
This language has special application to provisions similar to those in section 214 (a) (4) of the Revenue Act of 1918. See, also, N. Y. Ins. Co. v. Edwards, 271 U. S. 109, 116, 46 S. Ct. 436, 70 L. Ed. 859.
We think, therefore, that the payments to the mother and aunt were not "losses" within the meaning of section 214 (a) (4) of the Revenue Act of 1918.
It is true, however, that the Revenue Act of 1918 is broader than the act of 1913 by the inclusion of paragraph (5): "Losses sustained during the taxable year * * * if incurred in any transaction entered into for profit, though not connected with the trade or business"  and it is claimed that the payments by petitioner to his mother and aunt were losses within the meaning of this paragraph. But such losses must come from closed and completed transactions. Article 141, Treasury Regulations 45, supra; United States v. White Dental Co., 274 U. S. 398, 47 S. Ct. 598, 71 L. Ed. 1120. See, also, Lewellyn v. Electric Reduction Co., 275 U. S. 243, 48 S. Ct. 63, 74 L. Ed. 262. It cannot properly be said that there was a series of completed transactions between Julia and Elizabeth Mastin on the one hand, and Thomas Mastin and Theo Mastin Lovejoy on the other. There was, in our opinion, but one *753 transaction. The consideration from Julia Mastin and Elizabeth Mastin passed at once and as a whole. The consideration from Thomas Mastin and Theo Mastin Lovejoy passed by installments. Whether there was a loss to Thomas Mastin and Theo Mastin Lovejoy on the transaction could not be told until the transaction was closed. It was not closed until the deaths of Julia Mastin and Elizabeth Mastin, which did not occur until 1922. When the proper event occurred after their deaths, it might then be determined whether the petitioner sustained a loss by the transaction, which he was entitled to deduct from his gross income in computing his current income tax. See United States v. Flannery, 268 U. S. 98, 45 S. Ct. 420, 69 L. Ed. 865. Such a claim is not involved in the case at bar.
The Board of Tax Appeals adopted the view that the payments by petitioner to his mother and his aunt were not "losses," but payments for a capital asset. In its opinion attached to its findings it said:
"It is no different than if petitioner's mother and aunt had sold the stock for a cash consideration. In that event it could hardly have been contended that the cash paid for the stock was deductible as a loss unless or until the stock became worthless or the loss had been realized. Here the stock was to be paid for over an indefinite number of years until the death of the persons who were being paid for it."
We are in accord with the views thus expressed, and hold that the payments made by petitioner to his mother and aunt were not losses within the meaning of section 214 (a) (4) or (5) of the Revenue Act of 1918. There was no showing that the property rights acquired by petitioner under the agreement of 1914 were worthless. The burden of proof was on the taxpayer [Royal Packing Co. v. Commissioner of Internal Revenue (C. C. A.) 22 F.(2d) 536], and the burden was not sustained.
As to the payment by petitioner for advertising certain of the real estate belonging to the corpus of the trust estate, the Board of Tax Appeals made the following finding of fact:
"The petitioner in 1919 paid out the sum of $4,245.25 to Brent & Crittenden, real estate agents, for advertising real estate owned by the Mastin Realty & Mining Company. The petitioner owned stock in the corporation but did not own any of the real estate which was to be advertised. The other stockholders of the corporation did not pay out anything in this connection. The petitioner paid out the money because he deemed it an advantageous movement for the corporation and its stockholders. The Mastin Realty & Mining Company and others owned large property interests on the southern border of the principal business district of Kansas City. A movement was started by the parties to advertise this section. The amount so paid to Brent & Crittenden was to be distributed by them."
The payment was therefore made, not by petitioner to advertise his own real estate, not by the corporation to advertise real estate owned by it, but by petitioner as a voluntary one. It was, in our opinion, a capital expenditure, which might enhance the value of petitioner's stock by increasing the value of the lands of the corporation. It was not a loss within the meaning of the statute under discussion. Duffy v. Central R. Co. of N. J., 268 U. S. 55, 45 S. Ct. 429, 69 L. Ed. 846.
We think that the orders of the Board of Tax Appeals were correct, and they are affirmed.
NOTES
[1] of 1905.
"This Agreement, made and entered into, in quadruplicate, this 21st day of July, 1905, by and between Julia Mastin, Elizabeth Simpson Mastin, Theo Mastin and Thomas H. Mastin, Martha B. Mastin, the wife of Thomas H. Mastin, joining herein as such wife, Witnesseth, That,
"Whereas, Julia Mastin and Elizabeth Simpson Mastin and Thomas H. Mastin are the owners of the interests and properties mentioned in the schedule hereto attached and described in such schedules as schedules of the assets of the respective parties mentioned; and
"Whereas, because of the liens upon certain of such assets, it is necessary to provide for money or credit in order to protect, preserve and realize upon same to the best advantage, and said Thomas H. Mastin and Elizabeth Simpson Mastin are willing to furnish such money and credit to the extent of their personal resources as so scheduled and upon the conditions hereinafter set forth; and
"Whereas, said Julia Mastin and Elizabeth Simpson Mastin are advanced in years and desire to provide for the business management of their said assets scheduled by them to the extent and upon the conditions of the trust hereinafter set forth, and said Thomas H. Mastin is willing to undertake such management upon the conditions hereinafter set forth; and,
"Whereas, the parties hereto are related and desire that said Thomas H. Mastin and Theo Mastin and their consorts and descendants shall, subject to provision for an income for life to said Julia Mastin and Elizabeth Simpson Mastin, enjoy the benefits of the common estate as hereinafter provided, and to effect this purpose said Thomas H. Mastin and Elizabeth Simpson Mastin are willing to contribute the property scheduled by them, and said Thomas H. Mastin is willing to undertake the trust herein provided for upon the condition of provision for his sister and himself as hereinafter set forth.
"Now Therefore, In consideration of the premises and mutual love and affection, and of the respective contributions and agreements of the parties hereto, it is agreed that a corporation shall be caused to be formed by said Thomas H. Mastin under the laws of such jurisdiction as may be selected by him upon the advice of attorneys, with a capital stock of at least Fifty Thousand Dollars ($50,000.00), to be divided into shares of One Hundred Dollars ($100.00) each, which corporation shall be authorized to acquire, hold, manage, dispose of, sell and reinvest in any property of the character scheduled and other similar properties, the particular form of the statement of corporate purposes and the name of the corporation, and the general terms of its charter to be determined by said Thomas H. Mastin upon the advice of attorneys for the purpose of effecting the ends of this agreement; and that all of the foregoing interests as scheduled shall be conveyed, transferred, assigned and delivered to such corporation in payment for the capital stock thereof, and the same is hereby conveyed, transferred and assigned to said Thomas H. Mastin, in trust for such corporation to be formed on account thereof; that all of the capital stock of such corporation, except the number of shares necessary to qualify the persons, other than said Thomas H. Mastin, acting as directors, shall be held by said Thomas H. Mastin, as trustee upon the following conditions:
"First: Said trustee shall vote such stock according to his best judgment for the purpose of controlling and managing the business of such corporation and of the corporations in which such corporation to be formed may be a stockholder.
"Second: Such trustee, shall, during the life of Julia Mastin, Elizabeth Simpson Mastin, Theo Mastin and Thomas H. Mastin distribute the dividend declared on such capital stock held in trust to each of such four undivided interests in equal amounts.
"Third: Each of such four interests shall terminate with the death of the parties entitled to enjoy respectively such respective interests and such dividends shall thereupon be apportioned among the still surviving interests equally to each interest until there shall be but one interest still surviving, in which last event such trust shall terminate and such trustee shall transfer the title to such stock pro rata to the parties then entitled to the benefits thereof in proportion to their then respective rights to dividends.
"Fourth: In the use of the term `interest' as aforesaid, it is understood and agreed that said Julia Mastin and Elizabeth Simpson Mastin shall each personally and solely constitute one interest; that the said Theo Mastin and her husband and lineal heirs of her body, if she shall have such or either thereof, shall constitute one interest; that said Thomas H. Mastin, and his wife and lineal heirs of his body, if he shall have such, shall constitute one interest.
"Fifth: While said Theo Mastin shall live, the dividends apportionable to her interest shall be payable to her individually. If the said Theo Mastin die leaving a husband or lineal heirs of her body, the dividends apportionable to her interest shall be paid to such husband and such heirs, so long as there shall be a husband or such heirs, in porportion to their interests as surviving husband or such heirs of such Theo Mastin.
"If said Theo Mastin shall die without leaving a husband or lineal heirs of her body, or if she die leaving a husband or such heirs, and such husband and such heirs all die before the termination of all the other interests hereunder, then the interest of said Theo Mastin shall terminate and be extinguished.
"Sixth: While said Thomas H. Mastin shall live, the dividends apportionable to his interest shall be payable to him individually, and if he shall die leaving a wife or lineal heirs of his body, such dividends shall be paid to such wife and such heirs in proportion to their interest as surviving wife and such heirs of said Thomas H. Mastin.
"If such Thomas H. Mastin shall die leaving a wife or lineal heirs of his body, and such wife and such heirs all die before the termination of all the other interests hereunder, then the interest of said Thomas H. Mastin shall terminate and be extinguished.
"Seventh: Upon the death of all the parties hereto, or in case said Julia Mastin, Elizabeth Simpson Mastin and Thomas H. Mastin shall die before said Theo Mastin, this trust shall terminate, and such stock shall thereupon be transferred by the trustee to the persons who are then entitled to the dividends therefrom in the ratio of their respective interests therein.
"Eighth: Collateral heirs or consorts of descendants of said Theo Mastin and Thomas H. Mastin shall not be considered as or become entitled to any rights as heir under the provisions of this trust.
"Ninth: Such Trustee, shall, before the distribution of dividends, pay the actual expenses of household maintenance and sustenance for such beneficiaries of said trust as shall then continue to reside in the residence now jointly occupied by the parties hereto or as a common family in any other place of residence selected by such trustee in case of the sale of the present residence; and in the absence of dividends such trustee may advance the funds necessary for such expenses and deduct same from dividends thereafter earned.
"Tenth: In the case of the death, disability or refusal of said Thomas H. Mastin to act as Trustee, a successor in such trust may be appointed by instrument in writing signed by a majority in number of the adult individuals then entitled to the benefits of said trust. * * *
* * * * * *
"In Witness Whereof, The parties hereto have hereunto set their hands on the day and year first above written."
[2] of 1914.
"This Agreement, made and entered into this 2nd day of April, 1914, by and between Julia Mastin, Elizabeth Simpson Mastin, Theo Mastin Lovejoy, Thomas H. Mastin, Martha Brent Mastin and George Edgar Lovejoy, all of Kansas City, Jackson County, Missouri, Witnesseth:
"That, Whereas, Julia Mastin and Elizabeth Simpson Mastin are each owners of certain shares of stock in Mastin Estate and Mastin Realty and Mining Company, corporations organized and existing according to the laws of the State of Missouri, and other property in Jackson County, Missouri, and elsewhere, and,
"Whereas said Julia Mastin and Elizabeth Simpson Mastin are advanced in years and desire to provide for the care and management of said shares of stock and the property and business they represent and all the other property by them owned, and desire to divest themselves of the title, management and control of the said shares of stock and properties, and the said property abovesaid, and to vest the title to same in said Thomas H. Mastin and Theo Mastin Lovejoy upon the agreements and considerations hereinafter set forth; and
"Whereas said Thomas H. Mastin is willing to undertake the management and control of said shares of stock and properties and has this day agreed, and does hereby agree to undertake the management and control thereof, for the purpose of realizing an income and profit therefrom for the benefit and use of all the parties hereto.
"Now Therefore, in consideration of the premises and in consideration of the relationship of the parties, and in consideration of mutual love and affection and certain large sums heretofore advanced and paid out by the said Thomas H. Mastin for them, they, the said Julia Mastin and Elizabeth Simpson Mastin, do hereby transfer, set over and assign to the said Thomas H. Mastin and Theo Mastin Lovejoy all their right, title and interest in and to all the shares of stock in Mastin Estate and Mastin Realty and Mining Company by them owned, together with all dividends thereon accrued, and all the other property, of whatever character, by them owned as hereinabove mentioned, for and in consideration of the premises and considerations above set forth, and upon the further consideration that said Thomas H. Mastin and Theo Mastin Lovejoy shall pay the actual expenses and household maintenance and sustenance and support of the said Julia Mastin and Elizabeth Simpson Mastin during their natural lives, respectively whether they shall continue to reside in the residence now occupied by them or shall reside in some other place of residence by them hereafter selected.
"And it is further hereby agreed by and between the parties hereto that in the event the dividends and profits derived from the shares of stock hereinabove mentioned and described shall not be sufficient to provide for the said expenses and household maintenance and sustenance and support of the said Julia Mastin and Elizabeth Simpson Mastin that the said Thomas H. Mastin and the said Theo Mastin Lovejoy will provide and furnish such further sum or sums as shall be necessary for providing such expenses for household maintenance and sustenance and support, and they, the said Thomas H. Mastin and Theo Mastin Lovejoy hereby agree to pay same in the manner hereinabove agreed upon.
"And the said Julia Mastin and Elizabeth Simpson Mastin do hereby, assign, transfer and set over and deliver to the said Thomas H. Mastin and the said Theo Mastin Lovejoy all the property herein above described, being all the property, of whatever character, by them owned at the date of this contract, it being the intent of the said Julia Mastin and Elizabeth Simpson Mastin to assign, transfer and convey all their property, of every kind and nature, to the said Thomas H. Mastin and Theo Mastin Lovejoy for and in consideration of the other considerations, covenants and agreements herein entered into, and upon consideration whereof the said Thomas H. Mastin and Theo Mastin Lovejoy do hereby agree to perform all the agreements herein made on their part, and to the full execution, consummation and performance of this contract they do hereby bind themselves, their heirs, executors and administrators unto the said Julia Mastin and Elizabeth Simpson Mastin.
"This contract is made in substitution for and in lieu of all other contracts heretofore entered into by and between the parties hereto, and all rights and interests raised or created therein are hereby abrogated, particular reference being hereby made to a contract of date February 6, 1906, between the parties hereto, which said contract is hereby cancelled and annulled as of date of its execution.
"In Witness Whereof the parties hereto have hereunto subscribed their names to quadruplicate copies hereof, this 2nd day of April, 1914."