MARY S. PEABODY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 79907. Promulgated November 4, 1938.

*Peter L. Wentz, Esq.,* for the petitioner.
*W. Frank Gibbs, Esq.,* for the respondent.

OPINION.

MURDOCK: The Commissioner determined a deficiency of $5,920.01 in the petitioner's income tax for 1932. The only issue is whether the Commissioner erred in disallowing a deduction of $31,156.15 claimed as a loss on account of the worthlessness of preferred and common stock of the Middle West Utilities Co. The facts are hereby found

as stipulated. There is no question of the cost or ownership of the stock. The dispute is limited to whether the stock became worthless in 1932, as the petitioner contends, or whether it still had some value during that year. The petitioner deducted the cost of the stock as a loss on her return for 1932. The Commissioner denied the deduction, saying that "an examination of the affairs of this corporation discloses that the stock did not become completely and permanently worthless during the year 1932."

The Commissioner now relies almost entirely upon the decision of the Board in the case of *George H. Horning*, 35 B. T. A. 897. Horning was there claiming a loss on common and preferred stock of the Middle West Utilities Co. on the ground that it became worthless in 1932. Thus the issue there was identical with the issue here. The headnote and the statement of the question in the opinion indicate that the petitioner failed for lack of proof. Each case of this kind must be decided upon the evidence presented in that particular case. All of the evidence introduced in the *Horning* case to show worthlessness in 1932 has been introduced here, together with important additional evidence. The petitioner contends that all of this evidence now shows worthlessness of these two classes of stock in 1932.

The Middle West Utilities Co. (hereafter called Middle West) was a holding company incorporated under the laws of Delaware. Its assets consisted largely of stocks and bonds of subsidiaries. The latter were engaged in supplying electric service or were holding the securities of subsidiaries which were so engaged. There was considerable pyramiding of the holdings in the group. An involuntary petition in bankruptcy was filed on April 15, 1932, in a Federal District Court in Illinois, praying that Middle West be adjudicated a bankrupt. The court on the same day appointed receivers. The receivership resulted from the inability of Middle West to finance its obligations. The bankruptcy proceedings never came to an adjudication. Middle West had controlled eight large utilities systems and two large investment companies. It lost its entire eastern subsidiary group through bankruptcy and foreclosure during 1932. That group had earned 40 percent of the entire gross income of the Middle West group. But Middle West still served 2,882 communities. The book value of the assets of Middle West as of December 31, 1932, was $623,514,849.69. The liabilities shown upon its books at that time were $62,823,604.99 less than the above amount, so that the book value of the preferred and common stock was $62,823,604.99.

A committee for the holders of serial gold notes of Middle West in the amount of $40,000,000 made an appraisal of the assets and liabilities of Middle West and made a report dated November 12, 1932. This appraisal showed assets worth $13,526,879.20 and liabilities of

$57,080,460.56, not including capital stock. The appraisers estimated that some of the liabilities might be eliminated and that as much as 28 percent might be received by creditors including the note holders. It did not include among the assets certain securities having a book value of $90,486,925.77. The parties to the present proceeding have stipulated facts relating to the latter assets which indicate that those assets were worth much less than $5,000,000 at the close of 1932.

Quotations on Middle West securities were as follows:

| Period | Range of preferred | Range of common | Range of serial gold notes per $100 face |
|---|---|---|---|
| December 1932 | $0.50 -$1.75 | $0.125-$0.375 | $5-$10.00 |
| December 30, 1932 | .50 - .75 | .125 | 7- 7.50 |
| First week January 1933 | .50 - .75 | .125- .25 | 7- 7.75 |
| 1933 | .125- 3.50 | .125- .75 | |

Attempts were made to reorganize Middle West under section 77B of the Bankruptcy Act. An appraisal was made of its assets for that purpose, pursuant to a court order. The appraiser determined that the value of the assets on July 23, 1934, was $50,973,827 and that the liabilities exceeded the assets. The excess was over $15,000,000. A plan was finally agreed upon and was confirmed by the court on November 27, 1935. There was a statement in the plan that the assets of Middle West were much less than its liabilities and the preferred and common stockholders had no equity in its assets. The plan provided, however, that preferred stockholders should receive one share of $5 par value stock of the new company and a warrant to purchase one additional share for each four shares of the old preferred owned. It also provided that common stockholders should receive one share of the new common and a warrant to purchase an additional share for each 100 shares of old common owned. The warrants gave the right to purchase the new share on a sliding scale beginning at $8. Although the petitioner had taken no part in the court proceedings, she received her allotment of new shares and warrants, 20.5 shares and 20.5 warrants for her 82 shares of preferred and 21.64 shares and 21.64 warrants for her 2,164 shares of common.

Price ranges on November 27, 1935, were as follows:

New stock _____ $8.00 -$8.25
Warrants _____ 3.25 - 3.75
Old common_____ .125- .25
Old preferred _____ 2.50 - 3.00

The Middle West Utilities Co. was being operated at the close of 1932, its common and preferred stock had a substantial book value at that time, the common and preferred stock was quoted on the exchange, and in the final reorganization in 1935 the common and pre-

ferred stockholders received new shares and warrants for their old stock. The evidence in the record shows beyond doubt that the book value of the stock at the close of 1932 was a wholly unreliable guide to the real value of the stock. Although the old stock was still quoted at the close of 1932, the quoted prices were so low that they would scarcely justify or support a sale of an interest as large as that of this petitioner. The common was as low as it could possibly be quoted on the exchange. The petitioner received new shares and warrants in the latter part of 1935 in exchange for her old preferred and common stock. The value of the new property received was $500 or less, whereas the cost of her old stock was in excess of $31,000. The new shares and warrants were given to the old stockholders despite the fact that those stockholders had no equity whatsoever in the assets of the old corporation. The corporation, although operating, was placed in the hands of receivers during 1932 and it lost many of its properties during that year by bankruptcy and foreclosure, including its entire eastern subsidiary group. The appraisal of the committee for the note holders, together with the evidence as to the value of certain assets which were excluded from that appraisal, shows that the value of the assets of the company at the close of 1932 was at least $40,-000,000 less than its liabilities, not counting the common and preferred stock as liabilities. As has been stated above, the present record contains important evidence which was not presented in the *Horning* case. For example, the evidence relating to actual value of the $90,486,925.77 book value of assets was not presented in that case and apparently the loss of the eastern group was not shown. The evidence as a whole fairly preponderates in favor of the finding which we hereby make, that this common and preferred stock was worthless at the close of 1932. Cf. *John B. Marsh*, 38 B. T. A. 878. It follows that the petitioner is entitled to the deduction claimed.

*Decision will be entered under Rule 50.*