G. E. EMPLOYEES SECURITIES CORPORATION v. MANNING, Collector of Internal Revenue.

No. 770.

District Court, D. New Jersey.

Dec. 31, 1941.

658

William St. John Tozer, Henry Mannix, and Richard H. Appert, all of New York City, for plaintiff.

Charles M. Phillips, and Thorn Lord, both of Trenton, N. J., and Alexander Tucker, Sp. Asst. to the Atty. Gen., for defendant.

WALKER, District Judge.

The facts are:[1]

1. Plaintiff is a corporation duly organized and existing under the laws of the State of Delaware, is authorized to do business in the State of New Jersey, with an office in the City of Jersey City, State of New Jersey, and is a subsidiary of General Electric Company, its parent.

2. Defendant is and has been since July 11, 1938, the Collector of Internal Revenue of the United States for the Fifth District of New Jersey.

3. This is a suit of a civil nature at common law, arising under the Constitution and laws of the United States for internal revenue where the matter in controversy exceeds, exclusive of interest and costs, the sum of three thousand dollars.

4. During the period from May 5, 1925, to February 15, 1932, plaintiff acquired 47,301 shares of Common Stock of Middle West Utilities Company at a cost of $734,668, and on November 26, 1929, plaintiff acquired 2,000 shares of $6 Convertible Preferred Stock of Middle West Utilities Company at a cost of $209,645.54.

5. On April 14, 1932, a bill of complaint in equity was filed against said Middle West Utilities Company by Lincoln Printing Company, and on the next day an answer was filed by Middle West Utilities Company. On April 15, 1932, said court appointed receivers in equity of Middle West Utilities Company and on the same date an involuntary petition in bankruptcy was filed in the District Court of the United States for the Northern District of Illinois, Eastern Division, praying that Middle West Utilities Company be adjudicated a bankrupt. On April 16, 1932, United States District Court of Delaware named the same receivers and another as receivers for the Company's property in Delaware. The Company's receivers caused ancillary proceedings to be instituted in the jurisdictions where the Company's properties were located, and secured the appointment of ancillary receivers in twenty Federal judicial districts. Receivership was brought about as a result of the Company's inability to finance its obligations, including some $27,500,000 of bank loans, $10,000,000 of 5% notes due June 1, 1932, and interest on $30,000,000 additional of 5% notes. There was no adjudication of bankruptcy or non-bankruptcy of Middle West Utilities Company in any of the foregoing proceedings.

6. The aforesaid Middle West Utilities Company was a holding company incorporated under the laws of Delaware and

[1] Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

its assets consisted largely of the stocks and bonds of subsidiary companies engaged principally in supplying electrical service. Immediately prior to the aforesaid receivership, the Middle West Utilities Company controlled eight principal utilities systems, as follows:

Central Illinois Public Service Company;
Central and South West Utilities Company;
Kentucky Securities Corporation;
Kentucky Utilities Company;
Middle West Utilities Company of Canada, Ltd.;
National Electric Power Company;
North West Utilities Company;
United Public Service Company.

It also controlled two large investment companies, viz:

Mississippi Valley Utilities Investment Company
Great Lakes Securities Company

Immediately prior to said receivership Middle West Utilities Company owned or controlled 239 operating utility subsidiaries, 24 holding companies and 13 non-utility operating subsidiaries serving over 5,300 communities in the central, southwest and eastern states and the Dominion of Canada, with electricity, gas, street railway and bus service, water and ice.

7. On July 13, 1932, an amended involuntary petition in bankruptcy was filed in the District Court of the United States for the Northern District of Illinois, Eastern Division.

8. A committee representing holders of Serial Gold Notes of Middle West Utilities Company submitted a report to the holders of such notes under date of November 12, 1932.

9. The Receivers of Middle West Utilities Company on June 5, 1933, filed a report with the United States District Court for the Northern District of Illinois, Eastern Division. Said Receivers, with the approval of the Court, employed the accounting firm of Arthur Andersen & Co., to act as auditors for the Company and its subsidiaries.

10. Under date of July 30, 1933, the Preferred Stockholders' Committee sent a notice to the Preferred Stockholders of Middle West Utilities Company.

11. On June 7, 1934, there was filed in the District Court of the United States for the Northern District of Illinois, Eastern Division, a petition for the reorganization of Middle West Utilities Company, pursuant to Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. On June 14, 1934, an amended petition was filed. On July 23, 1934, said court approved said petition and appointed Daniel C. Green Trustee of the properties of the Company.

12. The Receivers of Middle West Utilities Company filed a second report with the United States District Court for the Northern District of Illinois, Eastern Division, on June 28, 1934. Said Receivers, with the approval of the Court, again employed the accounting firm of Arthur Andersen & Co. to act as auditors for the Company and its subsidiaries.

13. On August 11, 1934, the Committee hereinbefore mentioned, representing the holders of Serial Gold Notes of Middle West Utilities Company, submitted a third report to the holders of said Notes.

14. On September 28, 1934, certain creditors filed a petition for the relief of debtors under Sections 77A and 77B of the Bankruptcy Act, 11 U.S.C.A. §§ 206, 207, in the United States District Court for Delaware.

15. On October 23, 1934, there was filed in the District Court of the United States for the Northern District of Illinois, Eastern Division, by certain secured creditors of Middle West Utilities Company, a petition submitting a proposed plan of reorganization.

16. No balance sheet was published for Middle West Utilities Company as of December 31, 1934.

17. On February 28, 1935, the District Court of the United States for the Northern District of Illinois, Eastern Division, appointed Walter A. Shaw an appraiser to determine the value of the assets of the Company as of July 23, 1934. On April 22, 1935, said Walter A. Shaw filed a preliminary report.

18. On August 1, 1935, Daniel C. Green as Trustee of Middle West Utilities Company in the proceedings for the reorganization of that Company under Section 77B of the Bankruptcy Act filed his report with the Court.

19. Walter A. Shaw, appointed as aforesaid by the United States District Court for the Northern District of Illinois, Eastern Division, to determine the value of the assets of Middle West Utilities Company, submitted reports appraising said assets as of July 23, 1934, on August 15, 1935, and October 8, 1935.

20. On November 6, 1935, the Court filed a memorandum containing its suggestions with respect to the proposed plan of reorganization of Middle West Utilities Company.

21. On November 27, 1935, a decree and order of final confirmation was entered in the District Court of the United States for the Northern District of Illinois, Eastern Division, confirming and making effective a plan of reorganization dated September 24, 1934, as amended, of Middle West Utilities Company.

22. On December 28, 1935, the Securities and Exchange Commission held a hearing on the application of the Middle West Corporation for the approval of the issuance of securities under Section 7 of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79g, by the Middle West Corporation.

23. By December 31, 1935, the assets of Middle West Utilities Company had passed to the Middle West Corporation pursuant to the aforementioned Plan of Reorganization and decree of November 27, 1935, confirming the same, but no corporate balance sheet was published by the Middle West Corporation as of December 31, 1935.

24. Pursuant to said Plan of Reorganization, plaintiff received in January, 1936, the following securities of the Middle West Corporation in exchange for the Common and $6 Convertible Preferred Stock of Middle West Utilities Company acquired and held by plaintiff as above set forth:

(a) 500 shares of Common Stock of the Middle West Corporation (1 share for each 4 shares of $6 Convertible Preferred Stock of Middle West Utilities Company).

(b) 473.01 shares of Common Stock of the Middle West Corporation (1 share for each 100 shares of Common Stock of Middle West Utilities Company).

(c) 973.01 warrants entitling the holder to purchase shares of the Middle West Corporation in accordance with the Plan of Reorganization (1 warrant for each 4 shares of $6 Convertible Preferred Stock of Middle West Utilities Company and 1 warrant for each 100 shares of Common Stock of Middle West Utilities Company).

During 1936 plaintiff sold 873.01 shares out of said 973.01 shares of common stock of the Middle West Corporation and said 973.01 warrants of the Middle West Corporation.

25. Plaintiff allocated the cost of the shares of common stock and of the $6 Convertible Preferred Stock of Middle West Utilities Company to the common stock and warrants of the Middle West Corporation received in exchange therefor on the basis of the market quotations for said common stock and warrants of the Middle West Corporation. Under this method of computation the cost basis to the plaintiff of said 873.01 shares of common stock of the Middle West Corporation sold by the plaintiff out of the 973.01 shares received was $532,350.96, and the cost basis to the plaintiff for the said 973.01 warrants of the Middle West Corporation received and sold was $350,983.79. The defendant agrees that the above method of computation is correct in the event the common and preferred stock had not become worthless prior to the year 1936. It is further agreed by plaintiff and defendant that whether the reorganization of Middle West Utilities Company is or is not a tax free reorganization within the meaning of the Revenue Acts is not here in issue.

26. On June 15, 1936, Arthur Andersen & Co., submitted a report to Daniel C. Green, Trustee of Middle West Utilities Company, covering their examination of the asset and liability accounts of said Trustee, July 24, 1934 to November 27, 1935.

27. On December 24, 1936, Walter A. Shaw submitted a report to the Middle West Corporation valuing the assets taken over by the Middle West Corporation from Middle West Utilities Company as of the date of transfer, November 27, 1935.

28. On January 25, 1937, the Middle West Corporation filed a report of its acts in performance of the decree and order of final confirmation of the Plan of Reorganization entered November 27, 1935.

29. On May 14, 1937, pursuant to extension of time granted, plaintiff filed for itself with the then Collector of Internal Revenue for the Fifth District of New Jersey a Federal income and excess profits tax return for the calendar year 1936, under and pursuant to the provisions of the Act of Congress known as the Revenue Act of 1936, as amended, 26 U.S.C.A. Int. Rev.Acts, page 819, showing a net income of $2,533,579.29, a dividends received credit of $2,668,248.97, and no income or excess profits tax due for the year 1936. Plaintiff deducted in its return a loss of $868,-

179.89 incurred by it on the aforementioned sale of stock and warrants of the Middle West Corporation, which loss was computed by deducting from the cost basis of said stock and warrants the net proceeds received on said sale. Said loss was deducted as a capital loss from capital gains realized by plaintiff during the same taxable year, 1936, and such capital gains exceeded in amount all capital losses deducted therefrom.

30. Under date of April 22, 1937, the Middle West Corporation, successor to Middle West Utilities Company, under the plan of reorganization, issued its first annual report covering the year ending December 31, 1936.

31. On pages 28–30 of the August 1, 1935, Report of Daniel C. Green, Trustee, are listed the former subsidiaries and affiliated companies which were still in process of reorganization on July 1, 1935.

32. The aforementioned common stock and the aforementioned $6 Convertible Preferred Stock of Middle West Utilities Company were listed on the Chicago Stock Exchange and on the New York Curb Exchange and continued to be so listed throughout the entire period from the beginning of the receivership in 1932 through the date of reorganization in 1935 until February, 1936. The 5% notes of Middle West Utilities Company were listed on the New York Curb Exchange throughout the period from the beginning of the receivership in 1932 until January, 1933. Certificates of deposit representing said 5% notes were listed on the New York Curb Exchange from February, 1933, until after the end of 1935. The stock of the Middle West Corporation was listed on the Chicago Stock Exchange beginning February 1, 1936. The volume of sales and the price quotations for each week for the aforesaid stocks and securities were as reported in the Commercial and Financial Chronicle.

33. The Notes and general obligations of Middle West Utilities Company were superior in rank and preference to any rights of the preferred or common stockholders.

34. The Valuation Division of the Income Tax Unit of the Bureau of Internal Revenue consists of a staff of experts whose duty it is to make determinations of value in connection with the administration of the Revenue Laws. Said Valuation Division is in charge of all questions of value coming before the Bureau of Internal Revenue. On April 27, 1934, the Securities Section of said Valuation Division rendered a report recommending "that the common and preferred stock of the Middle West Utilities Company be held not to have become definitely and permanently worthless prior to December 31, 1933".

35. In October, 1939, the Internal Revenue Agent in Charge at Newark, New Jersey, determined a deficiency in plaintiff's Federal income tax for the calendar year 1936 in the amount of $95,667.26, and a deficiency in Federal excess profits tax for the said year in the amount of $88,-007.73, making a total deficiency of $183,-674.99.

36. On October 23, 1939, plaintiff executed and filed with the Internal Revenue Agent in Charge at Newark, New Jersey, a "Waiver of Restrictions on Assessment and Collection of Deficiency in Tax" on Treasury Department Form 870, and paid to defendant said alleged deficiency in the sum of $183,674.99, plus interest in the sum of $28,714.53, amounting in all to the sum of $212,389.52.

37. On May 6, 1940, defendant refunded to plaintiff the sum of $3.37, informing plaintiff that a re-examination of plaintiff's income tax account for the year 1936 disclosed that plaintiff's tax liability arising out of the alleged deficiency of $183,674.99 plus interest thereon amounted to the sum of $212,386.15, instead of the aforesaid sum of $212,389.52, which was paid by the plaintiff. Hence, the net amount paid to defendant on account of the assessment for said alleged deficiency and interest thereon amounted to the sum of $212,386.15.

38. Said deficiency resulted entirely from the disallowance of said loss in the amount of $868,179.89, incurred by plaintiff on the sale by it of said Common Stock and warrants of the Middle West Corporation and deducted by it in its return, upon the ground that the Common and $6 Convertible Preferred Stock of Middle West Utilities Company held by plaintiff prior to their exchange for Common Stock and warrants of the Middle West Corporation became worthless during some prior year.

39. Plaintiff's income tax returns for each of the years 1932 to 1935 inclusive showed a net loss.

40. Plaintiff had notice of all proceedings taken in the case of Lincoln Printing

Company v. Middle West Utilities Company, Equity 11654, and in the bankruptcy and reorganization proceedings entitled In the Matter of Middle West Utilities Company.

41. On November 17, 1939, plaintiff filed with the defendant a refund claim.

42. On January 4, 1940, the Commissioner of Internal Revenue mailed to plaintiff a notice of disallowance of said refund claim.[2]

### Discussion.

This is a suit by plaintiff to recover Federal income and excess profits taxes for the year 1936 which plaintiff claims were overpaid by it and erroneously and illegally collected by defendant.

The main controversy involves the question of worthlessness of the common and preferred stock of Middle West Utilities Company.

Prior to 1932 plaintiff acquired preferred and common stock in Middle West Utilities Company. In 1932 Middle West Utilities Company was placed in receivership where it remained until it went into reorganization pursuant to Section 77B of the Bankruptcy Act in 1934. Pursuant to the plan of reorganization in which those proceedings culminated, plaintiff in 1936 received in exchange for its stock in the old company 973.01 shares of stock and 973.01 warrants to purchase stock of the successor corporation, the Middle West Corporation. In the same year, 1936, plaintiff sold all the warrants and 873.01 shares of the new stock and deducted as a loss on its income tax return for 1936 the difference between the proceeds received from the stock and warrants sold and the cost of the old stock surrendered in acquiring said stock and warrants. The Internal Revenue Agent in Charge disallowed the deduction for said loss claimed by plaintiff on the ground that the preferred and common stock of Middle West Utilities Company had become worthless prior to 1936, and asserted a deficiency in income and excess profits taxes arising solely from the disallowance of said loss. Plaintiff paid the additional tax to the defendant and filed a claim for refund, which was rejected by the Commissioner of Internal Revenue. Plaintiff now brings this suit to recover said additional income and excess profits taxes paid to defendant.

The questions presented are:

Whether plaintiff sustained a loss upon the sale of its Middle West Utilities stock in 1936, as claimed by it, or whether the loss was sustained in some prior year as determined by the Commissioner?

Whether events transpiring subsequent to the sale of the stock in question are admissible in determining when the loss in question was sustained?

■ Mahler v. Commissioner[3], Peabody v. Commissioner[4], and Horning v. Commissioner[5] do not dispose of the issue in the instant case[6] nor are they stare decisis but they are entitled to great weight because they presented the identical question of loss on a similar statement of facts.

■ The Commissioner of Internal Revenue has determined that the stock in question became worthless prior to 1936 and G. E. Employees Securities Corporation was not entitled to the claimed deduction in 1936. This determination is presumed to be correct and the burden of proof is upon the plaintiff to establish its right to the deduction it claims.[7] G. E. Employees Securities Corporation must prove that the particular loss was sustained by it in the year 1936, the year in which it was deducted[8]. This rule has

---

[2] Facts Stipulated by the parties. Stipulation filed June 24, 1941.

[3] 2 Cir., 119 F.2d 869.

[4] 38 B.T.A. 1086.

[5] 35 B.T.A. 897.

[6] Radio Corp. v. Radio Engineering Laboratories, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163.

[7] United States v. Anderson, 269 U.S. 422, 443, 46 S.Ct. 131, 70 L.Ed. 347; Reinecke v. Spalding, 280 U.S. 227, 233, 50 S.Ct. 96, 74 L.Ed. 385; Burnet v. Houston, 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991; Lincoln Bank & Trust Co. v. Commissioner, 6 Cir., 51 F.2d 78; certiorari denied, 285 U.S. 548, 52 S.Ct.

405, 76 L.Ed. 939; Squier v. Commissioner, 2 Cir., 68 F.2d 25; Little v. Helvering, 8 Cir., 75 F.2d 436; Langford Inv. Co. v. Commissioner, 5 Cir., 77 F.2d 468; Jones v. Commissioner, 9 Cir., 103 F.2d 681; Burdan v. Commissioner, 3 Cir., 106 F.2d 207, 210.

[8] United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120; Mastin v. Commissioner, 8 Cir., 28 F.2d 748; De Loss v. Commissioner, 2 Cir., 28 F.2d 803, certiorari denied 279 U.S. 840, 49 S.Ct. 254, 73 L.Ed. 987; Seiberling v. Commissioner, 6 Cir., 38 F.2d 810; Deeds v. Commissioner, 6 Cir., 47 F.2d 695; Darling v. Commis-

been applied in cases where as in this case, the stock was subsequently sold for a nominal amount after the loss had been sustained[9]. The worthlessness should be established by some "identifiable event", the test to be applied is one of a practical not a legal nature and it consists in ascertaining when an "identifiable event" occurred that fixes the date on which an asset became worthless[10].

Receivership[11], insolvency[12] and reorganization[13] are elements indicating worthlessness, and are "identifiable events" determining the deductibility of worthless stock. Each played a part in the history of Middle West Utilities Company prior to 1936, and they are stated not in limitation but as events.

Plaintiff argues, that certain facts in Exhibit P-1 which contains an enumeration of events transpiring subsequent to the date of sales of stock in question, are admissible for the purpose of determining whether or not a loss was sustained by it on the date of the sale of the stock in question or some year prior thereto. Such events have no bearing upon the determination of worthlessness of the stock in question. It is well settled[14] that a loss will not be postponed to some indefinite period to ascertain more precisely whether the final outcome of the period of a given transaction will be a loss or a gain. If plaintiff's argument proceeded to its logical conclusion, taxpayers would be permitted to delay making a final accounting if they thought that something was going to happen later on that may determine whether a particular transaction was a gain or loss. The Supreme Court had before it a similar problem in the case of Ithaca Trust Co. v. United States[15], involving the value of the life estate of a widow who died within the year granted by the statute in which to file an estate tax return. Taxpayer contended that the value should be determined in the light of the future, but the Court said (279 U.S. at page 155, 49 S.Ct. at page 291, 73 L.Ed. 647):

"The question is whether the amount of the diminution, that is, the length of the postponement, is to be determined by the event as it turned out, of the widow's death within six months, or by mortality tables showing the probabilities as they stood on the day when the testator died. The first impression is that it is absurd to resort to statistical probabilities when you know the fact. But this is due to inaccurate thinking. The estate so far as may be is settled as of the date of the testator's death. * * * Therefore the value of the thing to be taxed must be estimated as of the time when the act is done. But the value of property at a given time depends upon the relative intensity of the social desire for it at that time, expressed in the money that it would bring in the market. See International Harvester Co. v. Kentucky, 234 U.S. 216, 222, 34 S.Ct. 853, 58 L.Ed. 1284. Like all values, as the word is used by the law, it depends largely on more or less certain prophecies of

sioner, 4 Cir., 49 F.2d 111; Keeney v. Commissioner, 2 Cir., 116 F.2d 401; Mahler v. Commissioner, supra; Gregory v. Kelly, D.C.N.J., 40 F.Supp. 142.

9 De Loss v. Commissioner, supra; Jeffery v. Commissioner, 6 Cir., 62 F.2d 661; Gowen v. Commissioner, 6 Cir., 65 F.2d 923; Brown v. Commissioner, 6 Cir., 94 F.2d 101, 104; Keeney v. Commissioner, supra; Wesch v. Helburn, D.C.W.D.Ky., 5 F.Supp. 581; Smith v. United States, D.C.Mass., 16 F.Supp. 393; DeFord v. Commissioner, 19 B.T.A. 339; Carroll v. Commissioner, 20 B.T.A. 1029; Meachem v. Commissioner, 22 B.T.A. 1091; Kayser v. Commissioner, 27 B.T.A. 816; Kramer v. Commissioner, 27 B.T.A. 1043; St. Louis Union Trust Co. v. Commissioner, 30 B.T.A. 370; Cass v. Commissioner, 32 B.T.A. 713, affirmed, 8 Cir., 83 F.2d 841; Moyer v. Commissioner, 35 B.T.A. 1155; 8 Fordham Law Review, p. 217.

10 Gregory v. Kelly, supra.

11 (April 14, 1932). Hobby v. Commis-

sioner, 5 Cir., 97 F.2d 731; Collmus v. Commissioner, 21 B.T.A. 210; Flynn v. Commissioner, 35 B.T.A. 1064; Peabody v. Commissioner, supra; Morton v. Commissioner, 38 B.T.A. 1270, 1278, 1279.

12 (July 23, 1934). In re Harrington, D.C.W.D.Mo., 1 F.2d 749; Dalton v. Bowers, 2 Cir., 56 F.2d 16; Gimbel v. Rothensies, D.C.E.D.Pa., 24 F.Supp. 117; Pearsall v. Commissioner, 10 B.T.A. 467; Gwynne v. Commissioner, 22 B.T.A. 164; Morton v. Commissioner, 38 B.T.A. 1270, affirmed, 7 Cir., 112 F.2d 320; Connelly v. Com'r, 42 B.T.A. 237.

13 (June 7, 1934) Petition filed. July 23, 1934 Trustee appointed.

14 Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383.

15 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647; See, also, United States v. Provident Trust Co., 291 U.S. 272, 275, 54 S.Ct. 389, 78 L.Ed. 793, and W. S. Bogle & Co. v. Commissioner, 7 Cir., 26 F.2d 771.

the future, and the value is no less real at that time if later the prophecy turns out false than when it comes out true. See Lewellyn v. Electric Reduction Co., 275 U.S. 243, 247, 48 S.Ct. 63, 72 L.Ed. 262; New York v. Sage, 239 U.S. 57, 61, 36 S.Ct. 25, 60 L.Ed. 143. Tempting as it is to correct uncertain probabilities by the now certain fact, we are of opinion that it cannot be done, but that the value of the wife's life interest must be estimated by the mortality tables. * * *"

### Conclusions of Law.

The preferred and common stock of Middle West Utilities Company was worthless "so far as human foresight could go" prior to 1936, and when the plaintiff received stock in the new company at the end of the year 1935 for old stock in Middle West Utilities Company, the new stock took on the value of the old.

The plaintiff has failed to sustain the burden of proof and judgment is in favor of the defendant.