## G. E. EMPLOYEES SECURITIES CORPORATION v. MANNING, Collector of Internal Revenue.

### No. 8118.

Circuit Court of Appeals, Third Circuit.

Argued Jan. 6, 1943.

Decided July 28, 1943.

Richard H. Appert and Henry Mannix, both of New York City (William St. John Tozer, of Teaneck, N. J., and White & Case, of New York City, on the brief), for appellant.

Joseph W. Burns, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and Helen R. Carloss, Sp. Assts. to the Atty. Gen., Charles M. Phillips, U. S. Atty., and Thorn Lord, Asst. U. S. Atty., both of Trenton, N. J., on the brief), for appellee.

Before MARIS, JONES, and GOODRICH, Circuit Judges.

MARIS, Circuit Judge.

Middle West Utilities Company, a holding company, incorporated in 1912, went into receivership in 1932. A petition for reorganization of the Company under Section 77B of the Bankruptcy Act, 11 U.S.C. A. § 207, was filed in 1934 and a plan of

reorganization was approved by decree in 1935. As part of the plan the assets of the Company were transferred to a newly formed corporation, Middle West Corporation; 90% of the Corporation stock was issued to the creditors of the Company and the remaining 10% to its preferred and common stockholders. G. E. Employees Securities Corporation, the plaintiff, had purchased prior to 1932 47,301 shares of common stock of the Company at a cost of $734,668.00 and 2,000 shares of preferred stock at a cost of $209,645.54. In 1936 pursuant to the plan and in exchange for its shares of preferred and common stock of the Company the plaintiff received shares of stock of the Corporation and warrants to subscribe for an equal number of shares. The plaintiff sold the stock and warrants in 1936 and received $15,154.86 in cash therefor. The expenses of the sale amounted to $171.32. The plaintiff sought to deduct from its 1936 gross income the loss sustained by it as a result of its investment in the Company stock but was not allowed the deduction on the ground that the stock had become worthless prior to 1936. The Commissioner assessed a defi-

ciency. The plaintiff paid under protest and brought suit for the recovery of the amount so paid against the collector of internal revenue in the District Court for the District of New Jersey. The case was tried to the court without a jury upon a stipulation of facts. The court entered judgment in favor of the defendant. 1941, 42 F.Supp. 657. The court later denied the plaintiff's motion for a new trial, amended and additional findings of fact and amended conclusions of law.

The right to deduct from the gross income losses sustained during the taxable year is provided by the Revenue Act of 1936[1] as implemented by treasury regulations.[2] The Commissioner determined that the Company stock had become worthless prior to 1936, that when the plaintiff received the Corporation securities in 1936 they had a basis of zero and that no loss therefore resulted from the sale of the Corporation securities in 1936. In a suit to recover a tax erroneously exacted the burden is upon the taxpayer to prove the facts establishing the invalidity of the tax.[3] Treating the Commissioner's determination as prima facie correct[4] the court concluded

---

[1] "Sec. 23. Deductions from Gross Income

"In computing net income there shall be allowed as deductions:

   *    *    *    *    *    *

"(f) Losses by Corporations. In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.

   *    *    *    *    *    *

"(j) Capital Losses. Losses from sales or exchanges of capital assets shall be allowed only to the extent provided in section 117(d)" 26 U.S.C.A. Int.Rev.Acts, pages 827, 828.

"Sec. 117. Capital Gains and Losses
   *    *    *    *    *    *

"(b) Definition of capital assets. For the purposes of this title, 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

   *    *    *    *    *    *

"(d) Limitation on capital losses. Losses from sales or exchanges of capital assets shall be allowed only to the extent of $2,000 plus the gains from such sales or ex-

changes. * * *" 26 U.S.C.A. Int.Rev. Acts, pages 873–875.

[2] Treasury Regulations 86, promulgated under the Revenue Act of 1934, provide:

"Art. 23(e)-4. Shrinkage in value of stocks.—A person possessing stock of a corporation can not deduct from gross income any amount claimed as a loss merely on account of shrinkage in value of such stock through fluctuation of the market or otherwise. The loss allowable in such cases is that actually suffered when the stock is disposed of. If stock of a corporation becomes worthless, its cost or other basis as determined and adjusted under Section 113 is deductible by the owner for the taxable year in which the stock became worthless, provided a satisfactory showing is made of its worthlessness.

   *    *    *    *    *    *

"Art. 23(f)-1. Losses by corporations.— * * * The provisions of articles * * * 23(e)-4, * * * are in general applicable to corporations as well as individuals. * * *"

[3] United States v. Anderson, 1926, 269 U.S. 422, 443, 46 S.Ct. 131, 70 L.Ed. 347; Reinecke v. Spalding, 1930, 280 U.S. 227, 232, 233, 50 S.Ct. 96, 74 L.Ed. 385; Burdan v. Commissioner of Internal Revenue, 3 Cir., 1939, 106 F.2d 207, 210.

[4] Welch v. Helvering, 1933, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212.

tha: the Company stock was worthless " 'so far as human foresight could go' prior to 1936". The plaintiff's position is that the Company stock was not worthless prior to 1936 when it was exchanged for the Corporation stock and warrants which were sold in 1936. Since the facts are not in dispute and indeed were stipulated the conclusions drawn from those facts are subject to appellate review.[5] The issue before us, therefore, is whether the district court's conclusion from the stipulated facts that the Company stock was worthless prior to 1936 is correct.

If the worthlessness of the stock were to be determined solely upon the fact that the liabilities exceeded the assets as disclosed by the corporate balance sheets it would be clear that the common stock became worthless in 1933 and the preferred not later than 1935. The April, 1932 balance sheets show assets of $308,505,713.59 and liabilities of $83,157,643.89. The Company had outstanding 607,396 shares of preferred stock of no par value and entitled to $100.00 per share on liquidation. The preferred was, therefore, entitled to $60,739,600.00 upon liquidation, leaving an equity of $159,608,469.70 for the common. The December, 1933 balance sheets show an equity of $16,218,669.06 for the preferred but nothing for the common. There are no corporate balance sheets for 1934. The June, 1935 balance sheets show total assets of but $50,973,827.05 which is so much less than liabilities as to leave no equity for preferred or common. This test might be accepted as entirely determinative in a case where the business is wound up and liquidation value is all that is left. It is clear, however, that though there would be no liquidation value there might well be potential value in the stock of a going concern. The plaintiff has directed part of its evidence to prove that from 1932 to and including 1935 there was potential value in the Company stock.[6]

By March 31, 1933 the receivers of the Company had achieved a reduction of $10,000,000 as compared to 1931 in the annual operation costs of its subsidiaries. The cost of operating the Chicago office of the Company had been decreased from $2,006,146 in 1931 to $594,675 in 1933. More than $1,000,000 annually in interest rate reductions were negotiated. Cash balances increased from $52,525.31 in 1932 to $899,603.18 in 1933. The cash position of the subsidiaries of the Company, exclusive of those in receivership or bankruptcy, increased from $5,828,830.75 in April, 1932 to $11,109,979.16 in December, 1933. The Company reduced its bank loans and accounts and notes payable from $38,798,893 in 1932 to $29,437,990 in 1933. The subsidiaries of the Company reduced theirs from $8,241,331 in 1932 to $2,843,878 in 1933. Several subsidiaries in 1933 purchased in the open market $1,904,100 of their own bonds at a cost of $1,371,618 and others met or anticipated maturities of funded debt. The physical properties of the operating subsidiaries were modern and in good condition and capable of producing much more electricity should the demand be made. Prospects for increased business were good. From this brief summary it may be seen that decreased operating costs, conservative management and increased business resulting in increased profits may well have given potential value to the stock of the Company.

By the end of 1934 the receivers' cash balances had increased to $1,503,821.00; the cash reserves of the subsidiaries had increased to $17,047,693.29; the outstanding funded debt of the subsidiaries was reduced by $3,539,400.00 face amount through the retirement of underlying bonds at a cost of $2,774,784.87. In the same period the Company had reduced its indebtedness from $29,437,990.00 to $26,488,223.00. There were good prospects of increased earnings. It is reasonable to conclude that under improved business conditions the income of the Company could be applied to reduce its indebtedness and eventually to provide an equity in the Company assets for the stockholders. This potential value was of such real importance that many bona fide in-

[5] Kuhn v. Princess Lida of Thurn & Taxis, 3 Cir., 119 F.2d 704.

[6] In Butler v. Commissioner, 1941, 45 B.T.A. 593, at page 601, The Board said: "Stock of a distressed corporation may have a potential value, even though it does not have a current liquidating value, if there is reasonable hope and expectation that in the future it may acquire a value through foreseeable operations. While such a potential value exists, the stock can not be said to be worthless. Sterling Morton [v. Commissioner], 38 B.T.A. 1270, affirmed, Morton v. Commissioner, [7 Cir.], 112 F.2d 320. See, also, Wesley V. E. Terhune [v. Commissioner], 40 B.T.A. 750."

vestors were willing to and did in fact pay considerable amounts for the stock.

Both the preferred and the common stock were traded in on the Chicago Exchange and the New York Curb Exchange throughout the years 1932 to 1935 inclusive. The plaintiff introduced stock market data both as to the volume of shares traded in and the prices which they brought. This evidence may be summarized:

These sales during the receivership to the end of 1935 represented about 20% of the total number of shares of common and 20% of the total number of shares of preferred stock outstanding. Moreover they represent 65 times the number of shares of common stock held by the plaintiff and 62 times the number of preferred shares which it held. It is thus reasonable to conclude that the market could have

### Preferred Stock

| Period | Shares Traded | High | Low |
|---|---|---|---|
| 1932 Subsequent to Receivership (4/16/32–12/30/32) | 17,180 | 4-1/2 | 1/2 |
| 1933 (12/31/32–12/29/33) | 27,375 | 3-3/4 | 1/8 |
| 1934 (12/30/33–12/28/34) | 29,770 | 2-1/2 | 1/8 |
| 1935 (12/29/34–12/27/35) | 49,750 | 3-5/8 | 1/4 |
| Sub-Total | 124,075 | | |
| 1936 (12/27/35–2/14/36) | 25,900 | 4-1/4 | 2-3/8 |
| Total | 149,975 | | |

### Common Stock

| Period | Shares Traded | High | Low |
|---|---|---|---|
| 1932 Subsequent to Receivership (4/16/32–12/30/32) | 820,100 | 1 | 1/8 |
| 1933 (12/31/32–12/29/33) | 841,247 | 3/4 | 1/16 |
| 1934 (12/30/33–12/28/34) | 682,681 | 1/2 | 1/16 |
| 1935 (12/29/34–12/27/35) | 768,150 | 7/16 | 1/16 |
| Sub-Total | 3,112,178 | | |
| 1936 (12/28/35–2/14/36) | 1,616,600 | 3/8 | 1/8 |
| Total | 4,728,778 | | |

Had the plaintiff's shares of preferred and common stock been sold at any time during the receivership and reorganization they would have realized the following amounts:

### 2,000 shares of preferred stock

| Year | Maximum | Minimum |
|---|---|---|
| 1932 (37 weeks ended Dec. 30) | $ 9,000.00 | $1,000.00 |
| 1933 | 7,500.00 | 250.00 |
| 1934 | 5,000.00 | 250.00 |
| 1935 | 7,250.00 | 500.00 |

### 47,301 shares of common stock

| Year | Maximum | Minimum |
|---|---|---|
| 1932 (37 weeks ended Dec. 30) | 47,301.00 | 5,912.63 |
| 1933 | 35,475.75 | 2,956.31 |
| 1934 | 23,650.50 | 2,956.31 |
| 1935 | 20,694.19 | 2,956.31 |

supported further sales of the stock in the volume held by the plaintiff. Since the evidence shows that a free and ready market existed in 1932, 1933, 1934 and 1935 the value of the stock may be established by the market quotations.[7]

█ The defendant urges that since the plaintiff sold stock having a cost of $944,-313.54 for $15,154.86, a return of less than two cents on the dollar, the value of the stock was for all practical purposes extinct. This does not appeal to us as a persuasive argument. Whether a stock has value does not depend upon what it costs. Can it be fairly said that the Company stock was worthless prior to 1936 as to the plaintiff because it had paid $15 a share for it but was not worthless as to one who had purchased it in 1932 at $1 a share? The most direct evidence that the stock had value is the fact that the plaintiff actually netted $15,000 from its sale, which though perhaps a nominal sum when compared to the cost of the stock to the plaintiff is surely a substantial sum when compared to the zero which the defendant asks us to treat as its equivalent.

The question as to the year in which the stock of Middle West Utilities Company became worthless has been passed upon by the Commissioner and the Board of Tax Appeals a number of times. In Horning v. Commissioner, 1937, 35 B.T.A. 897, the taxpayer claimed the deduction upon a loss arising out of the alleged worthlessness of the Middle West Utilities Company preferred and common stock in 1932. The Commissioner disallowed the deduction because he found the stock then had value and he was sustained by the Board. In Peabody v. Commissioner, 1938, 38 B.T.A. 1086, the claim of a loss on preferred and common in 1932 was disallowed by the Commissioner, but was allowed by the Board, which held that the taxpayer had sustained the burden of proving the stock to be worthless in 1932. In Mahler v. Commissioner, 2 Cir., 1941, 119 F.2d 869, the Commissioner disallowed the claim for

both preferred and common in 1934 or 1935 on the ground that the stock was not worthless prior to 1936. The Board found the stock had become worthless in 1932. It was affirmed by the Circuit Court of Appeals as to the common stock but reversed as to the preferred stock, which the court found did not become worthless until 1934. In Beach v. Commissioner, (C.C.H. B.T.A. Service, Dec. 12812c, August 10, 1942), the claim was made for a deduction in 1938 arising out of the loss on the common stock. It was disallowed by the Commissioner who contended the stock became worthless in a prior year but was allowed by the Board which held that the taxpayer sustained a loss in 1938 when he sold the stock. In Fearey v. Commissioner, 2 T.C. —— (June 8, 1943), the claim was for a loss on the common in 1938. The Commissioner disallowed the claim on the ground that the stock was worthless in 1932. The Tax Court allowed the claim. It found as a fact that the common stock of the Company did not become worthless when exchanged for stock and warrants in the Corporation nor had such stock and warrants become worthless when they were sold in 1938.[8]

These cases highlight the fact that the Commissioner has taken wholly inconsistent positions as to this very stock. Although in the Horning and Peabody cases he maintained that the preferred and common stock had value in 1932 and in the Mahler case that the preferred and common was not worthless prior to 1936, he determined in the Fearey case that the common stock was worthless in 1932. Likewise the decisions of the Board and the courts in these cases appear to be in hopeless conflict. They may readily be reconciled, however, if it is remembered that in each case the question before the Board or court was whether the taxpayer had met the burden of proving that the loss was in fact sustained in the year in which the taxable deduction was claimed. Therefore in each case the decision was dependent upon the amount and character of the proof introduced by the

[7] W. T. Grant Co. v. Duggan, 2 Cir., 1938, 94 F.2d 859.

[8] The Tax Court said "Whatever may be said as to the intrinsic value of the securities involved here, at any time prior to the date of their sale in 1938, we think the stock had potential value. * * * It was relatively small, it is true, but not so small as to prevent petitioner from realizing net proceeds from its sale. * * * That value was real. It was fixed by the opinions of free purchasers who backed those opinions with their money in an open market where the quantities dealt in leave no doubt as to its substance. The petitioner in good faith and in an arm's length transaction sold his stock on that market. He has never taken a position inconsistent with his present one."

642

particular taxpayer in support of his claim. It is clear that much of the evidence presented to the district court in the case now before us was not offered in these other cases.

The defendant relies upon certain appraisals and reports as conclusive proof that the Company stock was worthless prior to 1936. We note that some of these were compiled by groups or individuals whose interests would be best served by eliminating the stockholders from participating in the assets of the Company. At the most they tend to prove that the liabilities of the Company so far exceeded the assets that upon liquidation there would be nothing left for the stockholders. This is true of the reports of the Noteholders' Committee on November 12, 1932 and August 11, 1934, of the Baker report, the Jacobsen report, the Wall Street Journal statement the receivers' reports of June 5, 1933 and June 28, 1934, the auditors' report of July 24, 1934, the petition for reorganization and the report appended to the plan of reorganization of September 24, 1934, the Shaw preliminary report of April 22, 1935 and his second report of October 8, 1935. As we have seen, it does not follow from the fact that there would be no value upon liquidation that there was no potential value in the stock while the Company remained a going concern.

Our conclusion is that the district court erred in holding that the stock of the Company became worthless prior to 1936, and in failing to hold that the plaintiff's loss was sustained in 1936 upon the sale of the Corporation securities.

The judgment of the district court is reversed and the cause is remanded with directions to enter judgment in favor of the plaintiff for the amount of its claim.