LOS ANGELES SHIPBUILDING & DRY-DOCK CORPORATION, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

LOS ANGELES SHIPBUILDING & DRY-DOCK CORPORATION, a corporation, Plaintiff,

v.

Robert A. RIDDELL, District Director of Internal Revenue, Defendant.

Nos. 16501, 17206.

United States District Court
S. D. California,
Central Division.

Oct. 6, 1958.

Dempsey, Thayer, Deibert & Kumler, Arthur H. Deibert, William L. Kumler, Los Angeles, Cal., for plaintiff.

Laughlin E. Waters, U. S. Atty., Edward R. McHale, Asst. U. S. Atty., Chief, Tax Division, Robert H. Wyshak, Asst. U. S. Atty., Los Angeles, Cal., for defendant.

WESTOVER, District Judge.

Plaintiff, Los Angeles Shipbuilding & Drydock Corporation, is the end result of a reorganization under Section 77, sub. b of the Bankruptcy Act, 11 U.S. C.A. § 205, sub. b. Plaintiff's predecessor, Los Angeles Lumber Products Company, Limited, a California corporation, hereinafter referred to as Lumber, was incorporated on or about June 6, 1922 and then and thereafter, until its dissolution after 1941, had its principal place of business in San Pedro, Los Angeles County, California.

Prior to March 8, 1924, the following six named corporations had been acquired by and were wholly owned subsidiaries of Lumber:

A. Los Angeles Shipbuilding and Drydock Company, a corporation, referred to as Old L. A. Ship to distinguish it from plaintiff. Old L. A. Ship was engaged in building and repairing ships at the Los Angeles Harbor.

B. Puget Sound Lumber and Box Company, a Washington corporation, hereinafter referred to as Puget, was engaged in the business of operating a lumber yard, mill and box factory in Seattle, Washington.

C. Masset Timber, Limited, a British Columbia, Dominion of Canada corporation, hereinafter referred to as Masset, was engaged in the business of owning and operating a lumber mill at Graham Island, British Columbia, Canada, and also engaged in logging operations.

D. Pacific Wirebound Box Company, a California corporation, was engaged in the business of manufacturing wood boxes under a special patent.

E. Western Marine Supply Company, a California corporation, was engaged in the business of furnishing marine supplies to the shipping industry.

F. Los Angeles Lumber Products Steamship Company, a California corporation, was engaged in the business of operating coastal vessels between Graham Island and the Los Angeles Harbor and intermediate ports.

Hard times fell upon the lumbering and shipbuilding industries; Lumber and all its subsidiaries became insolvent, with the consequence that in 1937 a petition for reorganization under Section 77, sub. b of the Bankruptcy Act was filed in the United States District Court for the Southern District of California, under which proceedings a plan for reorganization was submitted to the court and subsequently approved. In re Los Angeles Lumber Products Co., 24 F. Supp. 501, affirmed 9 Cir., 100 F.2d 963. Certain interested parties objected to the plan, and upon certiorari to the Supreme Court the plan was set aside and the matter re-referred to the District Court in Los Angeles for further proceedings. Case v. Los Angeles Lumber Products Company, Limited, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110.

Subsequent thereto a new plan was proposed, and the Honorable Ralph E. Jenney, a Judge of the United States District Court in and for the Southern District of California, on April 30, 1940, made a final order confirming debtor's plan of reorganization dated February 21, 1940, being a modification of the plan dated May 24, 1937. As a result of the reorganization a new corporation, plaintiff herein, was formed to which was transferred all the assets of Lumber and its subsidiaries, except Masset and Puget.

In the two proceedings at bar plaintiff is attempting to secure a refund of taxes and interest paid for the years 1940 through 1943. Only the years 1942 and 1943 are before the court as the result of possible net operating loss deductions

based upon net operating loss carry-overs from the years 1940 and 1941.

In view of sundry concessions and abandonment of many of the contentions originally raised raised by the company, only two issues are now presented by the two actions for determination. These two issues for clarity will be denoted "Timber Losses" and "Puget Bad Debt Losses."

### Timber Losses

In 1932 Lumber acquired twenty-four year-to-year timber licenses in British Columbia, Canada. It was necessary for Lumber to pay when due to the Province of British Columbia, annual renewal fees. Such fees were not paid on twenty-two of the timber licenses after 1937, and fees were not paid on two of the timber licenses after 1938. No payments whatsoever were made after 1938 on any of the timber licenses.

Plaintiff contends twenty-two of these timber licenses were abandoned in 1940 and two were abandoned in 1941. Plaintiff is attempting to take as a loss the alleged cost of the twenty-two timber licenses in 1940 and the alleged cost of the remaining two in 1941.

Lumber acquired the twenty-four timber licenses in 1932 as a result of an agreement by and between Lumber, Great Western Timber Corporation, Limited, and Howard Cole. According to the agreement, Great Western Timber Corporation, Limited, agreed to sell, and Lumber agreed to buy the twenty-four timber licenses. Lumber agreed to pay to Great Western Timber Corporation, Limited, the sum of $40,000, lawful money of the Dominion of Canada ($33,718.-87 United States currency) for said licenses, which said sum was subsequently paid. The agreement also contained a clause by which Lumber and Great Western Timber Corporation, Limited, mutually agreed to

" * * * remise, release and forever acquit and discharge the other, its successors and assigns of and from all debts, sums of money, accounts. contracts, agreements, covenants, actions, suits, cause and causes of action, and suits, claims and demands whatsoever either at law or in equity or otherwise howsoever, which either of the said Parties now have or has or ever had or might or could have against the other of them, its successors or assigns on any account whatsoever of or concerning any matter, cause or thing whatsoever between them, * * *."

Plaintiff asserts that in addition to the $40,000, lawful money of the Dominion of Canada, plaintiff is also entitled to a claim which Lumber had in the sum of $440,700, to be classified as a part of the consideration for the twenty-four timber licenses.

It appears from the exhibit on file that at the time the agreement was entered into Lumber had the right to cut and carry away $440,700 of timber standing on 150 timber limits controlled by Great Western Timber Corporation, Limited. The timber could be cut and carried away by Lumber without further payment on the part of Lumber. Part of the consideration for transfer of the twenty-four timber licenses, contends plaintiff, was the giving up by Lumber of its right to cut and carry away the $440,700 in timber.

However, at the time the agreement was made, on February 22, 1932, the right to cut and carry away timber had no value, as the cost of cutting and processing timber exceeded the amount which could have been obtained on the open market from the resulting lumber. Although it is true that at the time the contract was entered into Lumber had a right to cut the timber and carry it away, nevertheless, from the evidence before it the Court must find this right was valueless. The agreement itself provides the consideration for the transfer of the twenty-four timber licenses was the sum of $40,000, lawful money of the Dominion of Canada. Under the circumstances the Court must hold that the consideration for the timber licenses in question was, as recited in the contract, $40,000, lawful money of the Dominion of Canada.

918

Plaintiff asserts twenty-two of the timber licenses were abandoned in 1940 and two in 1941. The government alleges the abandonment took place prior to 1940.

In 1936 Lumber had prepared by certified accountants a report setting forth the assets and liabilities then held and controlled by it. The report, which was submitted to and accepted by Lumber, disclosed that as of June 30, 1936 there was on the books of the company a book value of timber cutting licenses in the amount of $478,423.65 but that the value of the cutting licenses as of that date was, in reality, only $1; hence, in 1936, Lumber knew the twenty-four timber licenses which it held had no actual value.

Subsequent to receipt of this report and the indication that the licenses had no real value, Lumber decided to abandon the licenses. After 1937 it refused to pay the annual renewal fees on twenty-two of the licenses, and after 1938 it refused to pay the annual renewal fees on the other two. Lumber, after ceasing to pay the annual fees, did nothing whatsoever to indicate it had any interest in the timber licenses.

Plaintiff now contends that although Lumber refused and failed to pay annual license fees after 1937 and 1938 and subsequently received notice that the licenses had been cancelled, nevertheless, under the laws of British Columbia, applicable to annual renewal fees due on timber licenses, it had two years from the date of the notice to reinstate the licenses; that the two years did not expire on the twenty-two licenses until 1940 and on two licenses until 1941, and, consequently, there was no abandonment of the licenses until after the expiration of the period during which they could have been reinstated.

 The question of abandonment is a question of fact to be decided by the Court from all the evidence presented to it. There is no question that Lumber intended to abandon the licenses in 1938 and 1939 and did nothing to show a contrary intention. However, plaintiff asserts that Lumber did not have to do anything except to sit idly by and await the

running of the period of reinstatement and that the abandonment took place when the period of reinstatement expired. Plaintiff has not presented to the court any authority to support its assertion. It does cite a number of decisions on mortgage foreclosures, in which the courts have held loss from a mortgage foreclosure does not become effective until after expiration of the period of redemption.

This Court is of the opinion, from all the evidence before it, that it is justified in finding the abandonment of the licenses took place prior to 1940 and plaintiff did not have a right to claim the loss for the years 1940 and 1941.

The foregoing finding is based upon the assumption the twenty-four timber licenses were owned by Lumber. However, in his final order confirming debtor's plan of reorganization, dated April 30, 1940, Judge Jenney specifically found the twenty-four timber licenses were owned by Masset. The conclusion of the Court that the licenses in question were owned by Masset was based upon representations contained in the petition and the pleadings filed by Lumber and prepared by its counsel in the bankruptcy proceedings.

Based on the foregoing, the Court must find for the government in regard to the loss claimed by plaintiff arising out of the twenty-four timber licenses.

#### Puget Bad Debt

Lumber was incorporated on or about June 6, 1922. In September, 1922 Lumber became the sole owner of the outstanding stock of Puget in exchange for 730 shares of Lumber's capital stock plus $25,049.44 in cash. From August, 1922 to October, 1923 Puget expended approximately $700,000 in acquiring land and erecting and equipping a sawmill and box factory thereon. From and after November, 1922 to June, 1939 Lumber disbursed sums of money on behalf of and to Puget. Of these disbursements $195,876.29 was paid during 1924 directly to banks on account of loans made by Puget and guaranteed by Lumber.

The problem presented to the Court is whether the advancements made were loans or whether they represented capital investment.

Puget at the time of the acquisition by Lumber was under-capitalized in view of the extensive expansion program contemplated by Lumber. Puget could obtain the necessary finances for the expansion program only through borrowing from banks or advances from Lumber. Puget did in fact obtain approximately $200,000 from banks, but Puget could not borrow money without Lumber guaranteeing payment. When the loans became due and Puget was unable to pay, Lumber had to pay the guaranteed loans.

There is evidence on this item looking both ways; that is, that the advancements were in the nature of loans or were in the nature of a capital investment.

■ In the case of Wilshire & Western Sandwiches, Inc., v. C.I.R., 175 F.2d 718, at page 720 the Ninth Circuit points out that the intent of the parties as to the nature of the transaction controls.

The books of both Lumber and Puget indicate the transactions were considered as loans. The accounts receivable ledger of Lumber for Puget shows that on 12/16/22 there was a loan of $25,000 made to Puget by Lumber. Subsequent thereto other advances were made, and the ledger records them as "advances" rather than as loans. Lumber kept an account with Puget in which were recorded the advances made by Lumber either in the nature of money advanced or bills paid by Lumber, or taking up loans made by Puget at various banks. Records of both companies indicate these transactions were considered in the nature of loans.

A case somewhat similar to the case at bar is Maloney v. Spencer, 9 Cir., 172 F.2d 638. In that case the taxpayer caused to be incorporated three corporations. Aside from the directors' qualifying shares, taxpayer owned all the shares of the corporation. The corporations needed adequate financing. An agreement was made between the taxpayer and the corporations in which it was recognized that large sums of money would be required to finance the corporate operations, and the taxpayer agreed when required, to provide through advances or by guaranteeing loans, the necessary finances. Taxpayer's books of account showed that he treated the advances as debts due him from the corporations. Two of the corporations failed and were liquidated. Taxpayer, upon the liquidation, paid approximately $95,000 on loans which he had guaranteed. The District Court, 73 F.Supp. 657, held that the advances by the taxpayer were in the nature of a loan and not, as the government contended, a capital investment. The Ninth Circuit quotes from Van Clief v. Helvering, 77 U.S.App.D.C. 337, 135 F.2d 254, as follows [172 F.2d 641]:

"'* * * The fact that Van Clief made the advances to keep the corporation afloat rather than to liquidate it, has no tendency to show that a voluntary addition to capital rather than a loan was intended.'"

Exhibit 44 herein, which is the accounts receivable record of the Puget debt, indicates the first advancement was called a loan. However, at a regular meeting of the Board of Directors of Lumber, held October 17, 1923, the following resolution was adopted:

"Whereas, the Puget Sound Lumber & Box Company is indebted to this Company in the sum of approximately $400,000. and

"Whereas, said Company will need certain additional monies, and

"Whereas, said Company has purchased certain real estate on Lake Union in the City of Seattle, Washington, and has constructed thereon a complete Saw Mill and Box Factory, at a cost of approximately $700,000. and

"Whereas, said property is, in the judgment of this Board, reasonably worth said sum of $700,000.

"Now Therefore Be It Resolved, that the Officers of this Company be,

and they are hereby authorized to purchase the real estate, plant, machinery and equipment of Puget Sound Lumber and Box Company for said sum, and to pay therefor by cancelling the indebtedness of said Puget Sound Lumber and Box Company to this Company, and to pay the balance in cash."

Regardless of whether the advances made prior to October 17, 1923 were contributions to capital or in the nature of loans, they were wiped out by this transaction, and Lumber's claim for any advances made in the nature of loans must start as of October 17, 1923 or when the transfer was consummated.

■ While there is some evidence from which could be drawn a finding that advances after October 17, 1923 were capital investment, nevertheless, we are of the opinion the evidence preponderates that moneys advanced after October 17, 1923 were in the nature of loans rather than capital investment.

On the date of the signing of the final order confirming debtor's plan of reorganization, April 30, 1940, Lumber had a claim on its books against Puget in the sum of $1,696,061.56. Prior to the signing of the final order by Judge Jenney an agreement had been entered into between Lumber and other parties whereby Puget assets were to be sold and transferred, and Puget was to receive therefrom the sum of $29,424.77. Judge Jenney found in his final order that the sale of Puget assets to yield $29,424.77 was for the best interests of the debtor. Subsequent to the final order the assets of Puget were sold, and plaintiff received said sum of $29,424.77 which it applied on its account against Puget. This sum was received by Lumber in 1940. After receipt of the money and credit on the account, plaintiff now claims the right to take the balance due as a loss for the year 1940. The government contends the debt became worthless long before the consummation of sale and that prior to 1940 the Puget account had no actual value.

However, plaintiff did receive $29,424.- 77 from the sale of Puget assets during 1940. Compared to the amount claimed by plaintiff the sum of $29,424.77 may be very small and may indicate that prior to 1940 the account had little value; but $29,424.77 is not in itself and standing alone an insignificant amount. The issue in this regard to be determined by the Court is *when* the Puget account actually became worthless.

There is no question that the debt became partially worthless long before the payment of the $29,424.77. But was the taxpayer required to take a partial worthlessness bad debt loss, or could the taxpayer wait until the debt became totally worthless and then claim a bad debt deduction as of that date?

The Board of Tax Appeals in Moock Electric Supply Co. v. C. I. R., 41 B.T.A. 1209, says:

"* * * nothing seems to be better settled than that partial worthlessness, as distinguished from total uncollectibility, is a ground for deduction which may be pursued or relinquished by a taxpayer at his option. If he fails to take a deduction for partial worthlessness in any year, it does not have the effect of foreclosing him from a reliance upon different developments at another time. * * * Total worthlessness or disposition of the obligation remained open to this petitioner as a ground for deduction, notwithstanding the possibility that partial worthlessness may have appeared in an earlier year."

The rule is laid down by the Fourth Circuit in Reed v. Commissioner of Internal Revenue, 129 F.2d 908, at page 912, as follows:

"Furthermore, it should be noted that no deduction for a partial bad debt need be taken even though the taxpayer may have ascertained it to be partially worthless in a specific amount. He has a choice of charging off the amount he has deter-

mined to be bad and taking a partial bad debt deduction for that calendar year, or waiting until some future event definitely fixes the exact amount of his loss. This is entirely at the taxpayer's option."

The Circuit Court in G. E. Employees Securities Corp. v. Manning, 3 Cir., 137 F.2d 637, 641, said:

" * * * Whether a stock has value does not depend upon what it costs. Can it be fairly said that the Company stock was worthless prior to 1936 as to the plaintiff because it had paid $15 a share for it but was not worthless as to one who had purchased it in 1932 at $1 a share? The most direct evidence that the stock had value is the fact that the plaintiff actually netted $15,000 from its sale, which though perhaps a nominal sum when compared to the cost of the stock to the plaintiff is surely a substantial sum when compared to the zero which the defendant asks us to treat as its equivalent."

The Court will find from the evidence before it that the Puget debt did not become entirely worthless until after the credit in 1940 and that plaintiff had the right to treat the same as a bad debt deduction in its 1940 income tax return.

It is the government's position that if any deduction for the Puget bad debt loss is allowed, the deduction is limited to the fair market value as of the date of the final order confirming debtor's plan for reorganization, or the sum of $29,424.77.

The leading case on this subject appears to be Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775. The Supreme Court held that if there was in fact a reorganization (and in the case at bar we will hold there was), the taxpayer was entitled to use the asset basis of the old corporation. Since that decision the Court of Claims has been following the rule as laid down by the Supreme Court.

In Texas City Terminal Railway Co. v. United States, 152 F.Supp. 227, at page 235, 138 Ct.Cl. 739 (decided June 5, 1957), the Court of Claims had before it a problem similar to that presented in the cases at bar, and the Court held as follows:

"On the authority of Alabama Asphaltic Limestone Co., supra, we hold that plaintiff is entitled to use as the basis of the property transferred the same basis as that property would have had in the hands of its predecessor corporation, the Transportation Company."

Plaintiff is entitled to charge off as a bad debt loss in 1941 the amounts advanced Puget subsequent to October 17, 1923, or the date of the transfer of the property in question, less $29,424.77 received from the sale of the Puget assets.

Plaintiff is directed to prepare findings of fact, conclusions of law and judgment in conformity with the findings expressed herein, to be presented to the Court on or before the 29th day of October, 1958.