**LOS ANGELES SHIPBUILDING & DRY-DOCK CORPORATION, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**UNITED STATES of America, Appellant,**

v.

**LOS ANGELES SHIPBUILDING & DRY-DOCK CORPORATION, Appellee.**

No. 16630.

United States Court of Appeals Ninth Circuit.

March 22, 1961.

William L. Kumler and Arthur H. Deibert, Los Angeles, Cal., for appellant.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, I. Henry Kutz and Carolyn R. Just, Attorneys, Department of Justice, Washington, D. C., Laughlin E. Waters, U. S. Atty., and Robert H. Wyshak, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before CHAMBERS, BARNES and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

The district court entered judgment in favor of Los Angeles Shipbuilding & Drydock Corporation (hereinafter called "taxpayer") and against the United States for refund of income taxes erroneously paid for the taxable year 1941, in the sum of $208,870.78 together with interest on said amount at the rate of Six per centum (6%) per annum from the date of payment thereof to March 4, 1949, and interest at the rate of Six per centum (6%) per annum on the amount of $33,381.60 from March 4, 1949, to the date described by section 2411 of Title 28, U.S.C., less the amount of $175,489.18 which defendant shall have and recover of plaintiff against amounts herein adjudged due plaintiff from defendant.

The United States appeals from the judgment in favor of taxpayer, and the taxpayer appeals from that part of the judgment allowing the amount of $175,489.18 to defendant by way of offset and recoupment against amounts therein adjudged due taxpayer from the United States.

The district court had jurisdiction under Title 28 U.S.C.A. § 1346(a), and this Court's jurisdiction is based upon Title 28 U.S.C.A. §§ 1291 and 1294.

In order to point up the questions presented by these cross appeals, it is necessary to summarize events extending over a period of many years. The taxpayer is a California corporation which since February 1946 has been engaged in winding up its business and liquidating its assets. Taxpayer was organized in and pursuant to reorganization proceedings, under Section 77B of the National Bankruptcy Act, 48 Stat. 912, which proceedings were under the jurisdiction of the district court, and bore the title "In the Matter of Los Angeles Lumber Products Company, Ltd., a corporation, debtor". The debtor, (hereinafter referred to as "Lumber") was incorporated on or about June 6, 1922, and continued to exist until its dissolution after 1941. Prior to March 8, 1924, Lumber had acquired and thereafter until the commencement of the reorganization proceedings was the sole owner of six subsidiary corporations, of which the one important on this appeal is Puget Sound Lumber & Box Company (hereinafter referred· to as "Puget"). In September 1922 Lumber became the sole owner of all of the outstanding stock of Puget in exchange for 730 shares of Lumber's capital stock, plus $25,049.44 in cash. At the time of such acquisition by Lumber, Puget was under-capitalized in view of the extensive expansion program contemplated by Lumber. On or about March 8, 1924, Lumber executed a trust indenture securing an authorized issue of $3,500,000 of its first lien and collateral trust, 20-year, seven and one-half per cent sinking fund gold bonds. From August 1922 to October 1923, Puget expended approximately $700,000 in acquiring land and erecting and equipping a sawmill and box factory thereon. From November 1922 to June 1939, Lumber disbursed sums of money to and on behalf of Puget, of which $195,876.29 was paid, during 1924, directly to banks on account of loans made by Puget and guaranteed by Lumber. From November 1922 to January 1, 1939 sums of money were from time to time advanced· by Lumber to and on behalf of Puget, and from time to time other sums were repaid by Puget to Lumber and by the latter credited against sums then owing to it by Puget. As of January 1, 1939, the effective date of Lumber's reorganization, the net amount of sums loaned by Lumber to Puget, less amounts paid by Puget to Lumber, as shown by the records of the two companies, was $1,696,061.56. On May 27, 1937, $2,565,000 of the prin-

cipal amount of the bonds secured by the trust indenture remained outstanding, and on or before said date Lumber had become insolvent.

On or about January 28, 1938, Lumber filed its petition for reorganization hereinbefore mentioned. Pursuant to proceedings had therein, a plan of reorganization was submitted to and approved by the district court, by order dated July 19, 1938. Pursuant to said plan of reorganization, taxpayer herein was organized to act as transferee and successor of the assets and business of Lumber and its subsidiaries. See In re Los Angeles Lumber Products Co., 24 F.Supp. 501, affirmed 9 Cir., 100 F.2d 963. Certain interested parties objected to the plan. Upon petition for certiorari to the Supreme Court of the United States, the plan was set aside and the matter rereferred to the district court for further proceedings. Case v. Los Angeles Lumber Products Company, Ltd., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110. Subsequently, by order of the district court dated April 30, 1940, a new plan of reorganization of Lumber was approved. Pursuant to said new plan of reorganization: (1) taxpayer's articles of incorporation were amended to provide for one class of $1.00 par value, common, voting stock; (2) all of the assets and properties of Lumber (except stock of its subsidiaries which then had no value) of every kind and description, and all assets of Lumber's subsidiaries, except the assets of Puget, were assigned and transferred to taxpayer effective as of January 1, 1939, and all transfers, assignments and deliveries of such assets and properties made under the previous plan were ratified and confirmed by Lumber. Among the assets acquired by taxpayer from Lumber, pursuant to said transfers and assignments, was the aforesaid debt claim covering the indebtedness owed Lumber by Puget; (3) as the sole consideration given by taxpayer in exchange for the assets and properties acquired by it as aforesaid, taxpayer issued to Security-First National Bank of Los Angeles, as distributing agent for Lumber's bondholders 859,628 shares of its common voting stock; (4) in December 1940 Puget's assets were sold and on January 16, 1941, the net proceeds of said sale, $29,403.70, were paid over to taxpayer by Puget, and by taxpayer applied against the debt claim against Puget, acquired by taxpayer from Lumber, which said payment and application of moneys paid to taxpayer by Puget were specifically approved and ratified by order of the district court dated December 27, 1943, as being consistent with and in accordance with the plan approved by order of the court on April 30, 1940.

Taxpayer did not claim any loss on its income tax return for 1941, because of the alleged worthlessness of the debt from Puget to Lumber, but in its return for 1942 it claimed a net operating loss carry-over for 1941 by offsetting against 1941 net income a bad debt in the amount of $1,673,242.74 allegedly owing to its predecessor, Lumber, by Puget. The taxpayer filed timely claims for refund for the year 1941 based on the claimed bad debt loss of $1,673,242.74, which was disallowed by the Commissioner.

The district court found that Puget was indebted to Lumber on January 1, 1939, in the amount of $1,696,601.56, but that to arrive at the taxpayer's basis for the alleged debt there should be deducted from this sum the amount of $700,000, representing the sum of amounts of cash paid by Lumber to Puget, plus the indebtedness of Puget to Lumber cancelled as of October 7, 1923, which said cash was paid and indebtedness cancelled by action of Lumber's board of directors upon said date, in consideration of the transfer by Puget to Lumber of certain real estate and improvements then owned by Puget in the City of Seattle, Washington.

The district court also found that such indebtedness must be further reduced by the amount of $301,210.45, representing interest charged by Lumber on said records as due from Puget upon loans made by Lumber to Puget, but which interest taxpayer had not proved was included in Lumber's taxable income or was properly

includible in Lumber's basis for its debt claim against Puget. From the remaining sum of $694,851.11 the district court then deducted the amount of $29,403.70, which the taxpayer received on January 16, 1941 on account of the sale of the last remaining assets of Puget on December 16, 1940.

The district court found:

That the records of both Lumber and Puget show that the moneys advanced to and on behalf of Puget by Lumber were intended to be and were, in fact, loans by Lumber to Puget;

As of January 1, 1939, the effective date of the acquisition of Lumber's properties by taxpayer, Puget was indebted to Lumber upon loans made by Lumber to Puget in the net amount of $694,851.11;

That Lumber's debt claim against Puget in said amount was, by order of the district court dated April 30, 1940, transferred to taxpayer as an incident of the reorganization of Lumber under Section 77B of the National Bankruptcy Act;

At all times after October 23, 1923, to and including the date that Lumber's assets, including said debt claim, were transferred to taxpayer in the reorganization proceedings, Puget owned substantial amounts of real and personal properties to which resort could have been had by Lumber for the partial satisfaction of its debt claim against Puget;

That at all times prior to taxpayer's acquisition of said debt claim from Lumber said claim had substantial realizable value;

That at all times from the date the debt claim against Puget was acquired by taxpayer from Lumber, and until Puget's last remaining assets were paid over to taxpayer to be applied in partial satisfaction of said debt claim, to-wit, in January 1941, said debt claim had substantial realizable value in taxpayer's hands, and at no time during said period of time had said debt claim become worthless;

That said Puget debt claim became worthless in taxpayer's hands in January

1941, when the last of Puget's assets, to-wit, the sum of $29,403.70, was paid over by Puget to taxpayer, to be applied upon said debt claim;

That after the application of said $29,-403.70 to said debt claim, Puget was without other assets, and the balance of said debt claim of $665,447.41 then and there became totally worthless in January 1941;

Taxpayer's basis for determining loss upon sale or exchange of the debt claim against Puget, which taxpayer acquired from Lumber in the reorganization under Section 77B, was $694,851.11 as of January 1, 1939;

From and after January 1, 1939 until January 16, 1941, said basis continued to be not less than $694,851.11;

On January 16, 1941, upon payment to taxpayer of the last of Puget's assets, said debt claim in taxpayer's hands became worthless and taxpayer then sustained a loss from the worthlessness of the basis of said debt claim in the amount of $665,447.41;

The debt claim against Puget, acquired by taxpayer from Lumber, constituted property paid in for taxpayer's stock; and

The amount of such property so paid in for stock is equal to taxpayer's basis for such property for determining loss upon sale or exchange, and that said basis at the date said property was paid in was $694,851.11.

We will first consider the government's appeal. Basically, it is the government's position that under the record in this case the advances made by Lumber to Puget constitute contributions to capital as a matter of law, and that the district court erred in finding and holding that in 1941 Puget was indebted to the taxpayer in the amount of $665,447.41 for advances made by Lumber to Puget.

 In considering the government's appeal, it is to be borne in mind that the taxpayer was the prevailing party in the district court, and we must take that view of the evidence most favorable to it. The taxpayer is entitled .

to the benefit of all favorable inferences from the facts proved. If, when so viewed, there is substantial evidence to sustain the findings, the judgment may not be reversed by this Court unless the trial court was influenced by erroneous views of the law. Joseph v. Donover Company, Inc., 9 Cir., 1958, 261 F.2d 812; Hoon v. Harmer Steel Products Co., 9 Cir., 278 F.2d 427. The findings of fact of the trial court must be sustained unless they are clearly erroneous. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746. A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed. (Ibid.) It is not our function to re-try questions of fact determined by the trial court, even upon uncontradicted evidence where differing inferences may reasonably be drawn from it. Stockton Harbor Industrial Co. v. Commissioner of Internal Revenue, 9 Cir., 1954, 216 F.2d 638, certiorari denied 349 U.S. 904, 75 S.Ct. 581, 99 L.Ed. 1241. The burden is upon him who attacks a finding to show that it is clearly wrong. Grace Bros. v. Commissioner, 9 Cir., 1941, 173 F.2d 170. We will now proceed to review the questions of law presented on this appeal guided by the salutary well-established principles of law above set forth.

The United States contends: (1) that the advances made by Lumber to Puget constitute capital investments as a matter of law, rather than loans; (2) assuming that the advances created a debt, the debt was entirely worthless prior to the reorganization in 1939, and thus no debt was transferred to the taxpayer by Lumber in the reorganization; (3) assuming the advances were loans and assuming that the debt had been transferred to the taxpayer in the reorganization proceedings, any permitted deduction should be limited to the fair market value as of the date of the order confirming the final plan of the debtor's plan of reorganization or $29,403.70, the amount received for the remaining assets of Puget.

█ Whether or not the advances made by Lumber to and on behalf of Puget created a debt or constituted capital contributions is a question of fact to be determined by the trier of facts. Matthiessen v. Commissioner of Internal Revenue, 2 Cir., 1952, 194 F.2d 659.

█ We recognize that transactions between a parent corporation and its subsidiary are subject to close scrutiny; that a taxpayer claiming a right to a bad debt deduction has the burden to prove the same; that a bad debt deduction is a matter of legislative grace; and that the statutory provision granting the same must be strictly construed. Mindful of such principles, we have carefully examined the evidence before the district court, and we recognize, as did the district court that "There is evidence on this item looking both ways; that is, that the advancements were in the nature of loans or were in the nature of a capital investment." 166 F.Supp. 914, at page 919. Attention is also called to the following statement of the district judge, appearing at page 920 of the same opinion:

> "While there is some evidence from which could be drawn a finding that advances after October 17, 1923 were capital investment, nevertheless, we are of the opinion the evidence preponderates that moneys advanced after October 17, 1923 were in the nature of loans rather than capital investment."

This Circuit holds that the intention of the parties is a major factor in determining whether advances by stockholders to a corporation are loans or capital investment. Maloney v. Spencer, 9 Cir., 1949, 172 F.2d 638; Wilshire & West. Sandwiches v. Commissioner of Internal Revenue, 9 Cir., 1949, 175 F.2d 718. See also Ortmayer v. Commissioner of Internal Revenue, 7 Cir., 1959, 265 F.2d 848; Jennings v. United States, 7 Cir., 1959, 272 F.2d 842. In the instant case

**228**

the district court found that the moneys advanced to and on behalf of Puget by Lumber were intended to be and were, in fact, loans by lumber to Puget from the objective manifestations appearing in the record. The government contends that the district court should have found the advances to be capital contributions rather than loans, because of inadequate financing on the part of Puget, and that Lumber could not reasonably expect repayment. While no one factor or indicium is conclusive in determining the intent of the parties, we note that such factors were considered by the district judge in arriving at his ultimate finding. Under the record in this case we hold that the finding of the district court under discussion is not clearly erroneous.

 Assuming that Lumber's advances to Puget constituted a loan, the government contends that such debt was entirely worthless prior to the reorganization in 1939. Clearly, the debt claim against Puget was not worthless prior to the reorganization proceedings, since at all times up to the reorganization proceedings Puget owned property of substantial value from which some satisfaction of the debt could have been realized. Furthermore, over the years from time to time sums were repaid by Puget to Lumber and by the latter then credited against sums then owing to it by Puget. Nominal value of the property owned by Puget compared to the size of its debt to Lumber does not determine worthlessness, but rather worthlessness is determined by comparing the value of the property to a zero figure. Rockefeller v. Nunan (Commissioner), 2 Cir., 1944, 142 F.2d 354; G. E. Employees Security Co. v. Manning, 3 Cir., 1943, 137 F.2d 637; Greer Robbins Co. v. Commissioner, 9 Cir., 1941, 119 F.2d 92.

 The government next contends that the debt became worthless as of January 1, 1939, the effective date of the reorganization under the new plan, and hence that no debt was transferred to the taxpayer by Lumber in the reorganization. The government's theory appears to be that the reorganization proceedings divested Puget of any title to its property, and that the proceeds of the sale of Puget's property was paid to taxpayer on account of the bondholders' lien and not in satisfaction of the debt claim. The findings of the district court are contrary to this contention. The district court found that as a result of the modified reorganization taxpayer acquired all assets of Lumber except Puget. The district court found that the sum of $29,403.70 was received by Puget for the sale of its assets, and that this sum was paid to taxpayer in 1941, and that taxpayer applied said sum to its account against Puget in 1941. The first reorganization approved by the district court provided that Puget was to be liquidated and the proceeds from liquidation distributed pro rata among bondholders. However, this plan was invalidated by the Supreme Court on the ground that participation by Lumber's stockholders was not fair and equitable. Thus, the contemplated liquidation in the first reorganization plan is not material. In the modified reorganization order the district court determined that the sale of Puget's assets was in the best interests of the debtor. Accordingly, the court ordered sale of Puget's assets as soon as practicable, provided, however, if the pending sale of the properties of Puget referred to therein and in the plan shall have been completed prior to the transfer thereof to the new company (taxpayer), then the proceeds thereof shall be paid over to the new company as provided herein and in the plan; otherwise said properties may be held by the subsidiary until the time of said sale, which shall in any event be completed by said subsidiary. Following the sale of Puget's assets, and when the same were received by taxpayer in 1941, taxpayer applied them against the debt claim against Puget, and petitioned the district court for approval of this disposition of these assets. The district court stated that the action of the new company in crediting the proceeds of the sale toward the reduction of the debt claim was in accordance with the terms and provisions of the final order of April

30, 1940, and was a proper step in carrying out the plan of reorganization. We are satisfied the findings of the district court are not clearly erroneous.

The government contends that the debt became worthless prior to 1941. The reorganization did not divest Puget of its title to its property, as the modified order shows. The court allowed Puget to hold title to the property until sold, and approved the application of the proceeds from such sale to reduction of the debt. The district court correctly held that the debt did not become worthless until 1941 when the proceeds from the sale of Puget's remaining property was applied by the taxpayer to Puget's debt. The findings of the district court in this respect are not clearly erroneous. A deduction for partial worthlessness of a debt need not be taken even though the extent of such partial worthlessness may be ascertained at a given time. Moock Electric Supply Co., 1940, 41 B.T.A. 1209; Reed v. Commissioner, 4 Cir., 1942, 129 F.2d 908; Blair v. Commissioner, 2 Cir., 1937, 91 F.2d 992; Old Colony Trust Co. v. Hassett, 1 Cir., 1945, 150 F.2d 179.

Finally, the government contends that in any event the district court erred in not limiting the permitted deduction to the fair market value as of the date of the order confirming the final plan of reorganization or $29,403.70, the amount received from the remaining assets of Puget. This result is required, argues the government, because of the provisions of Section 270 of the Bankruptcy Act (Title 11 U.S.C.A. § 670), which in pertinent part provides:

"In determining the basis of property for any purposes of any law of the United States * * *, the basis of the debtor's property (other than money) or of such property (other than money) as is transferred to any person required to use the debtor's basis in whole or in part shall be decreased by an amount equal to the amount by which the indebtedness of the debtor, not including accrued interest unpaid and not resulting in a tax benefit on any income tax return, *has been canceled or reduced in a proceeding under this chapter*, but the basis of any particular property shall not be decreased to an amount less than the fair market value of such property as of the date of entry of the order confirming the plan. * * * "
(Italics ours.)

It is to be recalled that under the new plan of reorganization approved April 30, 1940 that the sole consideration given by taxpayer in exchange for the assets of the properties acquired by it taxpayer issued to the Security-First National Bank of Los Angeles, as distributing agent for Lumber's bondholders, 859,628 shares of its common voting stock. The district court found that under and pursuant to the plan of reorganization Lumber's indebtedness due to its bondholders was not canceled or reduced, but rather, under and pursuant to said plan, Lumber's obligations due to bondholders were continued in another form, to-wit, in the form of a capital stock liability to taxpayer. It was found that the taxpayer's basis for determining loss on sale or exchange of the debt claim of Puget was $694,851.11 as of January 1, 1939, and that taxpayer's base continued to be not less than this amount until January 16, 1941, on which date, upon payment to the taxpayer of the proceeds from the sale of Puget's assets, the debt claim in taxpayer's hands became worthless. Under such findings, which cannot be said to be clearly erroneous, we hold that the provisions of Section 270 of the Bankruptcy Act are inapplicable to the instant case, and that the government's reliance thereon is misplaced. See Motor Mart Trust, 1945, 4 T.C. 931, affirmed in Commissioner v. Motor Mart Trust, 1 Cir., 1946, 156 F.2d 122; Tower Building Corp., 1946, 6 T.C. 125; Alcazar Hotel, Inc., 1943, 1 T.C. 872. In G.C.M. 25277 (1947–1 C.B. 44) the Commissioner acquiesced in the Alcazar, Motor Mart and Tower cases. He also withdrew an earlier ruling, G.C.M. 22528 (1941–1 C.B.

193), and cited with approval the position of the Tax Court:

"It is the position of that court, as set forth in the above-cited decisions in which the Commissioner has now acquiesced, that where stock is issued for bonds, or other evidences of indebtedness, plus accumulated interest thereon, no cancellation of indebtedness results within the meaning of § 270 of the Bankruptcy Act as amended. The court holds that in such a case the issuance of stock for an indebtedness does not cancel the indebtedness but merely continues the obligation in another form."

We now proceed to consider the taxpayer's appeal. An extensive stipulation of facts was entered into by the parties before trial. Included among many matters stipulated was the following paragraph No. 53:

"There is an outstanding unpaid balance of an assessment of excess profits taxes and interest for 1943 in the sum of $175,489.18, which was assessed March 4, 1949. The plaintiff does not stipulate or agree to the amount of this assessment. In the event that the Court determines that there have been any payments or credits, for any of the years here claimed, in excess of the correct tax liabilities including interest for such years, then judgment therefor shall be reduced to the extent of the lesser of said outstanding unpaid balance or the difference between said outstanding unpaid balance and the net overassessment determined by the Court for the year 1943, if any, which has not been satisfied by payment or the application of credits."

The district court found that excess profits taxes for 1943 in the amount of $61,751.99, and interest on account of the late payment of the excess profits taxes for 1943 in the amount of $113,737.19, were timely assessed but unpaid. However, it found that collection of these amounts totaling $175,489.18 was barred by the statute of limitations at the time the instant proceedings were commenced. In the trial court the government argued that in the event judgment should be entered in favor of the taxpayer for refund of income taxes erroneously paid a proper construction of the stipulation required that interest be computed on the amount of such judgment from the date of payment thereof to March 4, 1949 [date of assessment on excess profits tax and interest for the year 1943], at which time the amount of the judgment should be reduced by said sum of $175,489.18, and thereafter interest should be paid only on the remaining amount of $33,-381.60 [the amount of the overpayment less $175,489.18].

The taxpayer argued that the plain language of the stipulation required interest on the full amount of the judgment from the date of overpayment to the date prescribed by Section 2411 of Title 28 U.S.C., from which total of principal and interest should be deducted said sum of $175,489.18. The district judge concluded that, notwithstanding collection of said sum of $175,489.18 was barred by statute, the government, pursuant to stipulation, was entitled to offset and recoup said sum against any sums otherwise due taxpayer. Judgment was entered accordingly. The formula used by the district court was the one set forth in Section 3771 of the Internal Revenue Code of 1939, which in its pertinent parts is as follows:

"Sec. 3771. Interest on Overpayments.

"(a) Rate.—Interest shall be allowed and paid upon any overpayment in respect of any internal revenue tax at the rate of 6 per centum per annum.

"(b) Period.—Such interest shall be allowed and paid as follows:

"(1) [as amended by Sec. 83(b) of the Technical Amendments Act of 1958, P.L. 85–866, 72 Stat. 1606] Credits.—In the case of a credit from the date of the overpayment to the due date of the amount against

which the credit is taken * * *." 26 U.S.C. 1952 Ed. § 3771.

The taxpayer argues that this is a mis-application of the stipulation, arguing as follows: "What the agreement *says* and what it is intended to mean is that there would be first determined the amount of tax overpaid by taxpayer, if any, for any of the years claimed. To this would then be added interest on such overpayments determined without reference to any credits or barred tax liabilities. Lastly, the potential judgment for such tax over-payments and interest would then be 're-duced' by $175,489.18, or such lesser sum as was properly due but unpaid the gov-ernment for 1943." At another point the taxpayer says: "The maximum re-duction to which the parties agreed in the stipulation was $175,489.18."

The district judge concluded that, not-withstanding the collection of said sum of $175,489.18 was barred by statute of limitations, the government, pursuant to stipulation, was entitled to offset and re-coup said sum against any other sums due taxpayer. The government insists that the taxpayer be held to this stipula-tion, and the taxpayer agrees to be bound by the stipulation as follows: "This agreement was made with due regard to concessions made by the government. Taxpayer sought to honor that agree-ment in drawing the proposed judgment. Taxpayer will still honor that agreement if the judgment in its favor is affirmed by this Court." The question on this appeal is simply whether the district court properly construed the stipulation.

The construction of the stip-ulation is a matter of law, and courts are not bound to accept, as controlling, stip-ulation of the parties as to a question of law. Swift & Co. v. Hocking, 1917, 243 U.S. 281, 37 S.Ct. 287, 61 L.Ed. 722; Estate of Sanford v. Commissioner, 1940, 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20. "While the parties may fix the facts by stipulation, they cannot thus change the law." Crabb v. Commissioner, 5 Cir., 1941, 121 F.2d 1015, 1016.

The controlling statutes in respect to credits against tax liability after limita-tion period are:

"Sec. 3770. Authority to Make Abatements, Credits and Refunds.

"(a) To Taxpayers.—

* * * * * *

"(2) Assessments and collections after limitation period.—Any tax (or any interest, penalty, additional amount, or addition to such tax) assessed or paid after the expiration of the period of limitation properly applicable thereto shall be consider-ed an overpayment and shall be credited or refunded to the taxpayer if claim therefor is filed within the period of limitation for filing such claim. * * *" 26 U.S.C. 1952 Ed., § 3770.

"Sec. 3775. Credits After Periods of Limitation

"(a) Period Against United States.—Any credit against a lia-bility in respect of any taxable year shall be void if the payment in re-spect of such liability would be con-sidered an overpayment under Sec-tion 3770(a) (2). * * *" 26 U.S.C. 1952 Ed. § 3775.

The government concedes that collec-tion of unpaid excess profits tax and in-terest for 1943, totaling $175,489.18, was barred by the statute of limitations. Furthermore, the government apparently concedes that absent the stipulation the government would not be entitled to off-set and recoup such amount against any sums otherwise due to the taxpayer as determined in the proceedings below. No conduct on the part of the taxpayer pre-cluded the government from timely seek-ing collection of the deficiency. We find that cases relied upon by the government, such as Stearns Co., Boston, Mass. v. United States, 1939, 291 U.S. 54, 54 S. Ct. 325, 78 L.Ed. 647, are, therefore, in-apposite. Clearly, under Section 3770(a) (2) payment of the barred deficiency for 1943, if made, would constitute an overpayment, the refund of which would be mandatory if claim therefor be filed

within the period of limitation for filing such claim. Since the payment of the barred deficiency for 1943 would constitute an overpayment under Section 3770(a) (2), it necessarily follows that any credit of the 1941 overpayment against that barred deficiency would be void under Section 3775(a). See American Light & Traction Co. v. Harrison, 7 Cir., 1944, 142 F.2d 639.

Therefore, if the stipulation the parties entered into be construed to grant the government a credit against the barred tax liability of 1943, such stipulation cannot be given effect under the foregoing sections. If the stipulation be construed to allow the government to set off the 1941 overpayment against the barred deficiency for 1943 on the theory of equitable recoupment, the stipulation is likewise ineffective. In Rothensies v. Electric Battery Co., 1946, 329 U.S. 296, at page 299, 67 S.Ct. 271, at page 272, 91 L.Ed. 296, it is stated:

"It is not contended that there is any statutory warrant for allowing barred tax refund claims by way of recoupment or otherwise.[1] Authority for it is said to be found in case law and taxpayer relies chiefly on two decisions of this Court, Bull v. United States, 295 U.S. 247, [55 S. Ct. 695, 79 L.Ed. 1421,] and Stone v. White, 301 U.S. 532 [57 S.Ct. 851, 81 L.Ed. 1265]. The essence of the doctrine of recoupment is stated in the Bull case: 'recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded.' 295 U.S. 247, 262 [55 S.Ct. 695]. It has never been thought to allow one transaction to be offset against another, but only to permit a transaction which is made the subject of suit by a plaintiff to be examined in all its aspects, and judgment to be rendered that does justice in view of the one transaction as a whole.

"The application of this general principle to concrete cases in both of the cited decisions is instructive as to the limited scope given to recoupment in tax litigation. In both cases a single transaction constituted the taxable event claimed upon and the one considered in recoupment. In both, the single transaction or taxable event had been subjected to two taxes on inconsistent legal theories, and what was mistakenly paid was recouped against what was correctly due. In Bull v. United States, the one taxable event was receipt by executors of a sum of money. An effort was made to tax it twice—once under the Income Tax Act as income to the estate after decedent's death and once under the Estate Tax Act as part of decedent's gross estate. This Court held that the amount of the tax collected on a wrong theory should be allowed in recoupment against an assessment under the correct theory.[2] In Stone v. White, likewise, both the claim and recoupment involved a single taxable event, which was receipt by an estate of income for a period. The trustees had paid the income tax on it but this Court held it was taxable to the beneficiary. Assessment

"1. Indeed, the applicable provisions of the Revenue Act of 1928 seem to direct a result opposite to that asked by respondent. Section 608 provides that 'A refund of any portion of an internal-revenue tax (or any interest, penalty, additional amount, or addition to such tax) made after the enactment of this Act, shall be considered erroneous—(a) if made after the expiration of the period of limitation for filing claim therefor, unless within such period claim was filed; * * *' Section 609(b) provides, 'A credit of an overpayment in respect of any tax shall be void if a refund of such overpayment would be considered erroneous under Section 608.' 45 Stat. 874, 875, 26 U.S. C.A. Int.Rev.Acts page 460. And cf. McEachern v. Rose, 302 U.S. 56 [58 S. Ct. 84, 82 L.Ed. 46].

"2. But the Court emphasized that refund of the incorrect tax was not barred by the statute at the time the Government proceeded for collection of the correct tax."

against the beneficiary had meanwhile become barred. Then the trustees sued for a refund, which would inure to the beneficiary. The Court treated the transaction as a whole and allowed recoupment of the tax which the beneficiary should have paid against the tax the Government should not have collected from the trustees. Whatever may have been said indicating a broader scope to the doctrine of recoupment, these facts are the only ones in which it has been applied by this Court in tax cases."

In our view, the facts in the instant case do not permit the application of the doctrine of equitable recoupment. The tax deficiency here arises from excess profits taxes in 1943, which are in no way related to taxpayer's bad debt deduction in 1941.

█ Thus, we hold that the stipulation cannot be construed to allow a credit against a barred tax deficiency, or to allow the government to secure such credit under the doctrine of equitable recoupment. See also United States v. Herring, 4 Cir., 1957, 240 F.2d 225; United States v. Bowcut, 9 Cir., 1961, 287 F.2d 654.

█ It does not follow from what we have said concerning the stipulation that such stipulation must be entirely disregarded. We can give effect to it as a provision reducing the amount of judgment by an ascertainable amount. State decisions have allowed parties to reduce the amount of judgment by consent. Sharp v. Allgood, 100 Ala. 183, 14 So. 16. The federal courts have shown liberality in allowing the parties to stipulate as to the amount of a judgment. Thus, the parties can stipulate to an amount in excess of the amount prayed for. Neff v. Western Coop. Hatcheries, 10 Cir., 1957, 241 F.2d 357. A stipulation as to what is just compensation in a condemnation proceeding will not be disturbed absent unusual circumstances calling upon the court to invoke its equity powers. United States v. Town of Clarksville, 4 Cir., 1955, 224 F.2d 712. In Morse

Boulger Destructor Co. v. Camden Fibre Mills, 3 Cir., 1956, 239 F.2d 382, the parties stipulated to a judgment in a contract action. In a later petition for interest from the date of breach to the date of judgment, the court denied this claim, holding that the parties were bound by their stipulation which did not include interest, absent a showing of grounds for withdrawal of the stipulation, such as inadvertence, improvidence, in entering into the stipulation, or extreme prejudice to the party bound. In light of the above authorities, we see no reason why taxpayer could not voluntarily agree to reduce judgment by a certain amount. Taxpayer admits that the government gave concessions for the stipulation, and taxpayer is willing to abide by the agreement into which it voluntarily entered. We hold then that the parties are bound by the stipulation, and judgment should have been rendered in accordance therewith.

█ In determining that the government was entitled to recoup, the district judge stated that he was allowing such recoupment in accordance with the stipulation. The formula used by him for determining interest is set forth in 26 U.S.C. § 3771(b) (1) supra. It is to be noted that the amendment to Section 3771(b) (1), which provides that interest shall be allowed "In the case of a credit, from the date of the overpayment to the due date of the amount against which the credit is taken," became effective several months after the date of the stipulation and it can not be said that the stipulation contemplated the amendment. Since, however, we have held that the stipulation was not effective so as to create a credit against a barred tax deficiency, the trial court erred in computing interest on the basis of a formula embracing such credit. While the taxpayer did not stipulate to the amount of the unpaid tax and interest on the barred deficiency for 1943, it nevertheless stipulated that any judgment for refund on the 1941 tax would be reduced to the amount of such figure as the trial court should determine. No one has questioned

the district court's determination of the amount of $175,489.18.

In our view, the court should have rendered judgment for the taxpayer for the amount of the overpayment, with interest from the date of the overpayment to the date prescribed by Section 2411, Title 28 U.S.C., reduced by the sum of $175,489.18, in accordance with the stipulation.

The judgment of the district court is vacated and set aside, and the matter is remanded to the district court for entry of judgment in favor of the taxpayer consistent with the views herein expressed.